**UNITED STATES of America, Appellee,**

v.

**Peter J. CASTIGLIA, Jack Liffiton and Anthony Santiago, Defendants–Appellants.**

**Nos. 327, 328 and 558, Dockets 89–1207, 89–1209 and 89–1216.**

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 1989.

Decided Jan. 17, 1990.

Opinion on Denial of Rehearing No. 89–1207 March 20, 1990.

Judith Blake Manzella, Buffalo, N.Y. (Edward C. Cosgrove, Buffalo, N.Y., of counsel), for defendant-appellant Peter Castiglia.

Charles H. Dougherty, Buffalo, N.Y. (Albrecht, Maguire, Heffern & Gregg, Buffalo, N.Y., of counsel), for defendant-appellant Anthony Santiago.

Jack D. Liffiton, Getzville, N.Y., pro se.

Gretchen L. Wylegala, Asst. U.S. Atty., Buffalo, N.Y. (Dennis C. Vacco, U.S. Atty. W.D.N.Y., Denise E. O'Donnell, Susan M. Barbour, Asst. U.S. Attys., Buffalo, N.Y., of counsel), for appellee.

Before KAUFMAN, TIMBERS and WINTER, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This case requires us to decide whether a bank officer abused his control of the bank's money—through a series of allegedly sham loans that appellants portray as innocent creative financing—to the point of violating the law.

Peter Castiglia, the bank officer, Jack Liffiton, and Anthony Santiago appeal from judgments of conviction entered in the United States District Court for the Western District of New York after a jury trial before Judge Elfvin. Appellants' primary contention is that the Government has stretched the statute prohibiting "misapplication" of bank funds by a bank officer, 18 U.S.C. § 656, beyond its legitimate contours, thereby criminalizing perfectly proper business transactions. We are asked to rule that no "misapplication" occurred and that this prosecution represents an overzealous use of a criminal statute in an inappropriate situation. We decline to do so, since persuasive proof at trial established that the defendants carried out a complex and audacious scheme to obtain bank funds in a manner long recognized as misapplication. Because we also reject appellants' other challenges, we affirm the convictions.

The jury found that Castiglia, as Senior Commercial Lending Officer at the Buffalo branch of the Bank of New York ("BONY"), orchestrated a duet of sham loans with the assistance of named borrowers Santiago and Tocha, both of whom were assured that they would not be responsible for repayment of the loans. The real beneficiaries of the loan proceeds were Castiglia, his corporate alter ego (Geneva Lands, Inc.), and a friend (Liffiton)—none of whom were eligible to receive these loans directly without special authorization from Castiglia's superiors. Since appellants challenge the sufficiency of the evidence supporting their convictions, we begin with an abbreviated summary of what

the jury could have found, viewing the evidence in the light most favorable to the Government, as we are required. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

In September 1981, as we already noted, Castiglia was Senior Commercial Lending Officer at BONY, an FDIC-insured institution. BONY's internal regulations restricted Castiglia's authority. He could not make personal or commercial loans to himself without bank approval,[1] nor could he authorize more than one million dollars in aggregate unsecured loans to any one borrower. He was required to disclose any outside business or partnership relationships, particularly any such relationships with bank customers.

Despite these rules, Castiglia failed to report to BONY his exclusive ownership of Geneva Lands, a real estate holding company. Castiglia and Geneva Lands were as one. He borrowed money from other banks in the corporate name for personal purposes, and listed himself as the sole shareholder on the corporate tax returns.

In September 1981, Castiglia arranged for a $580,000 BONY loan to be issued in Anthony Santiago's name. Utilizing an attorney escrow account, Castiglia directed the funnelling of these funds through a series of circuitous transactions. By mid-November $505,000 had been laundered into various accounts belonging to Castiglia, Geneva Lands, and Liffiton.[2] Liffiton, whose unsecured BONY loans already exceeded BONY's one million dollar limit, received four checks totalling $188,000. Although Castiglia subsequently completed several bank Code of Conduct Questionnaires, he failed to disclose his interest in Geneva Lands and the $580,000 loan that had benefitted him, his company, and Liffiton.

Appellants claim that Santiago recognized his obligation to repay the $580,000 and simply reloaned the principal. Santiago, however, did not enter the loan on his

**1.** 12 U.S.C. § 375a limits the instances in which a bank may extend credit to its officers and requires prompt reporting to the board of directors of any such loan.

**2.** $71,443.29 in prepaid interest was held by the bank. Santiago retained over $3,500.

books. He merely instructed his bookkeeper to put a copy of the loan note in Castiglia's file. As a precaution against Castiglia's inability to repay the loan in the event of death, Santiago expected to be named beneficiary of a $580,000 insurance policy on Castiglia's life. Even though his substantial interest payment entitled him to a large tax deduction, Santiago's accountants were not informed of the loan. Nor did he repay the loan when it became due in June 1982. Instead, Castiglia arranged for it to be renewed.

Upon learning that Geneva Lands was under federal investigation, Castiglia immediately arranged to pay off the $580,000 debt. Within 48 hours, he convinced his friend Richard Tocha to borrow $400,000 from BONY, and applied this sum to the outstanding loan. The remaining $180,000 balance was exchanged for a demand note in Santiago's name. Castiglia then arranged with Santiago to retire the $180,000 loan by selling stock that BONY held as collateral on another debt, putting the bank at risk.

When Santiago's accountant learned of the original loan, after Castiglia's resignation from the bank, Santiago explained that he borrowed the money for Castiglia, who handled all the transactions and was responsible for repayment of the loan. Concerned about the lack of loan documentation and Castiglia's imminent surgery, Santiago's accountant obtained from Castiglia a personal promissory note for $180,000. Following surgery, however, Castiglia substituted Geneva Lands as the obligor on this note and conveyed an explanation to Santiago's attorney and accountant which

concealed his personal interest in the loan. Santiago adopted this characterization.

In an interview with the FBI, Tocha echoed Santiago, claiming that he was assured upon signing the $400,000 note that he would not be called upon to pay the principal or interest.[3] Both Santiago and Tocha looked to Castiglia for the interest payments. Santiago instructed his bookkeeper to call Castiglia if interest payments were late on the $180,000 loan. Tocha added the interest due on the $400,000 loan to bills sent to Castiglia for construction work performed by Tocha.

Despite a frantic effort to conceal the convoluted transactions—including the alteration of records and an attempt by Liffiton to induce Santiago to shield Castiglia with false testimony—Castiglia, Liffiton, and Santiago were convicted of conspiracy, 18 U.S.C. § 371, and a variety of substantive offenses linked to the misapplication of funds.[4] Only Tocha was acquitted of all charges. While appellants raise a multitude of contentions, we shall discuss in some detail their central claim that no "misapplication" occurred.

An officer of a federally-insured bank who "embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds, or credits" of the bank with the intent to injure, defraud or deceive that bank commits a criminal misapplication. 18 U.S.C. § 656; *United States v. Docherty*, 468 F.2d 989 (2d Cir.1972). Castiglia was an officer of BONY, a federally-insured institution. Thus, the only issue before us is whether Castiglia's conduct amounts to willful misapplication.

---

3. Tocha recanted at trial, denying he made such a statement.

4. Specifically, Castiglia was convicted on two counts of misapplication of bank funds. 18 U.S.C. § 656. Liffiton and Santiago were convicted of aiding and abetting the $580,000 misapplication. 18 U.S.C. § 2. Castiglia was convicted of making, and Santiago with aiding and abetting the making of, false entries in bank records for the $580,000 loan. 18 U.S.C. §§ 1005, 2. Castiglia was convicted of the same offense with respect to the $400,000 loan, and for false entries on the bank Code of Conduct Questionnaires. Liffiton was also convicted of perjury before the grand jury. 18 U.S.C. § 1623.

Judgments of conviction were entered for Castiglia and Liffiton on April 17, 1989, and for Santiago on May 1, 1989.

Castiglia was sentenced to 4 concurrent one year terms of imprisonment for conspiracy, two false entries, and the $580,000 misapplication. He also was sentenced to two concurrent one year terms for the $400,000 misapplication and false entry. Liffiton was sentenced to concurrent one year terms for conspiracy and misapplication with a consecutive year for perjury. Santiago was sentenced to three years probation and a $7,500 fine. Execution of all sentences was stayed during appeal.

■ Appellants contend that we are precluded from finding misapplication because Tocha and Santiago were financially able to repay their loans and recognized their legal obligations to do so. Their argument purportedly rests on our decision in *United States v. Docherty* and finds support in the First Circuit's opinion in *United States v. Gens*, 493 F.2d 216 (1st Cir.1974). In *Docherty* we held that there was no misapplication where the borrower had ample resources and "knew he was putting his own credit on the line." 468 F.2d at 995. *Gens* held that "where the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot—absent other circumstances—properly be characterized as sham or dummy...." 493 F.2d at 222.

It appears that both Santiago and Tocha had the resources to pay the loans and had executed all the relevant documents. Accordingly, Appellants assert that this settles the issue. However, this contention ignores one long recognized category of misapplication:

> cases in which bank officials assured the named debtor, regardless of his financial capabilities, that they would look for repayment only to the third party who actually received the loan proceeds: in other words where the debtor allowed only his name to be used, enabling the bank officials to grant a *de facto* loan to a third party to whom the bank was unwilling to grant a formal loan.

*Id.; see also United States v. Cleary*, 565 F.2d 43, 47 (2d Cir.1977) (misapplication occurs where bank official assures named debtor he would not be called upon to repay), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1469, 55 L.Ed.2d 506 (1978). Such a formally executed loan "could be characterized as 'sham' or 'dummy' ..., because there was little likelihood or expectation that the named debtor would repay." *Gens*, 493 F.2d at 222.

The key issue is whether the named borrowers fully understood and recognized their obligations to repay. "[L]oans of this character are improper only if the lending officer had no reason to expect that the named debtor would repay them; *e.g.,* where the officer knew that the named debtor was fictitious, had not authorized the use of his name, or was incapable of repaying the loan, or where the bank official assured the named debtor that he would not be called upon to repay." *Cleary*, 565 F.2d at 47 (*citing Gens*, 493 F.2d at 221–23). Since *Gens* accurately defines misapplication to include situations where the bank official assured the named borrower that he would not be responsible for repayment—as all appellants concede—it necessarily follows that a signature on loan documents does not conclusively establish an intent to repay. Intent must be interpreted in light of the evidence that the bank official assured the named borrower that he would not be looked to for repayment because the officer would repay. Where such evidence is persuasive, misapplication has been established.

For example, in *Gens* the First Circuit reversed the convictions of nominee borrowers who recognized their repayment obligations, but remanded the one count involving a wealthy individual who signed his note with the understanding that he personally would not have to repay the loan, barring some "catastrophe." 493 F.2d at 220, 223. *See also United States v. King*, 484 F.2d 924, 926–27 (10th Cir.1973) (nominee borrower signed note with the understanding that bank official would actually repay loan), *cert. denied*, 416 U.S. 904, 94 S.Ct. 1607, 40 L.Ed.2d 108 (1974); *United States v. Moraites*, 456 F.2d 435, 438 (3d Cir.) (nominee borrower signed notes after bank officer assured it it would not have any obligation to repay), *cert. denied*, 409 U.S. 891, 93 S.Ct. 109, 34 L.Ed.2d 148 (1972). Nothing in *Docherty* suggests that such assurances were extended to the nominee borrower. The bank officer only "requested that Docherty borrow [money] and reloan it to him," apparently without making the additional representation that he would not be looked to for repayment. 468 F.2d at 991.

In the instant case, the record amply supports the conclusion that Castiglia assured each named debtor that "he would not be called upon to repay" the loan.

*Cleary*, 565 F.2d at 47. Santiago admitted this to his accountant; Tocha stated so to the FBI. Other evidence—Santiago's unusual bookkeeping, Tocha's method of billing Castiglia for interest, Liffiton's attempt to influence Santiago's testimony—indicates a conscious effort to conceal the sham nature of the loans.

The dissent reads into precedent a nonexistent distinction between "assurances by a bank officer that the [named] borrower will not be looked to for repayment because the officer will repay and a similar [situation in which an officer] gives assurances that *the bank* will not look to the borrower [were] the loan [ ] not repaid." However, knowing participation in a sham loan which could have the natural tendency to harm the bank is sufficient to find a principal liable for misapplication, *see Gens*, 493 F.2d at 222, even though mere knowledge of a nominal borrower that a transaction violates a bank rule would not support a conviction for aiding and abetting. *Docherty*, 468 F.2d at 993.

By assuring the named borrowers that they would not have to repay the loans, Castiglia manifested the criminal intent to enter into sham transactions at the risk of the bank. While the dissent believes that Castiglia's statement to Santiago that he would not be looked to for repayment "could as well describe the borrower in *Docherty*," it is significant that these words were not *ascribed* to the bank official in that case. This is the distinction that makes all the difference.

In *Docherty*, the bank official convinced a nominal borrower to obtain a loan for the benefit of the former at no risk to the bank. In contrast, Castiglia persuaded Santiago to lend his name to a similar transaction, adding the assurance that Castiglia was responsible for repayment. The natural effect of such an assurance would be to cause the named borrower to believe that he would not have to repay the loan and that, one way or another, the bank officer would discharge the obligation. This amounts to willful misapplication of bank funds.

The fact that Santiago may have believed that he would be ultimately liable in the event the note was not repaid does not absolve Castiglia of his wrongful intent when entering into the loan. Moreover, Santiago's behavior with regard to the life insurance policy and Castiglia's execution of a formal note do not suggest that Santiago intended to repay the loan. The life insurance policy hedged against one eventuality that would prevent Castiglia from repaying the debt—his death. The issuance of the promissory note, following Castiglia's resignation from the bank, was Santiago's similar attempt to bind Castiglia to his assurance of repayment. Both suggest only that Santiago sought to hold Castiglia to his promise to repay. We note that Castiglia persuaded Santiago to change his books to conceal any personal interest of Castiglia in the series of loans.

In sum, the evidence in this case demonstrates that the borrowers had been assured that Castiglia was responsible for repaying the loans.[5] The question remains whether there was an intent to injure, defraud, or deceive the bank, the requisite *mens rea* under Section 656. *See Docherty*, 468 F.2d at 994–95. If the "natural effect" of Castiglia's conduct put BONY in

---

**5.** Moreover, we have suggested, and other Circuits have held squarely, that misapplication occurs whenever a bank officer knowingly causes a "loan to be made to his own benefit, concealing his interest from the bank." *United States v. Fortunato*, 402 F.2d 79, 81 (2d Cir. 1968), *cert. denied*, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969); *United States v. Woods*, 877 F.2d 477, 479 (6th Cir.1989); *United States v. Shively*, 715 F.2d 260, 265–66 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984); *United States v. Steffen*, 641 F.2d 591, 597 (8th Cir.), *cert. denied*, 452 U.S. 943, 101 S.Ct. 3091, 69 L.Ed.2d 959 (1981); *United States v. Krepps*, 605 F.2d 101, 106–07 (3d Cir.1979); *United States v. Twiford*, 600 F.2d 1339 (10th Cir.1979); *United States v. Kennedy*, 564 F.2d 1329, 1338–39 (9th Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). The holdings in *Gens* and *Docherty* appear contrary to this line of authority. We simply note that the Third Circuit has queried whether *Gens* (and, by implication, *Docherty*) would be decided in the same way today, since in 1978 Congress severely limited the circumstances under which a bank may make loans to its officers. *Krepps*, 605 F.2d at 107 n. 21; 12 U.S.C. § 375b.

jeopardy of loss, there was an intent to injure or defraud. Whether BONY suffered any actual loss is of little importance. *United States v. Clark*, 765 F.2d 297, 303–05 (2d Cir.1985); *Cleary*, 565 F.2d at 47–48.

The bank rules that Castiglia violated were designed to protect BONY from exposure to increased pecuniary risk. Liffiton already had exceeded BONY's unsecured loan limit, yet Castiglia funnelled almost $200,000 to him. In addition, Castiglia breached bank rules and federal regulatory statutes designed to prevent bank officers from granting loans to themselves. His flouting of the safeguards necessary for BONY's security is also demonstrated by the sale of collateral pledged to another loan to pay off the $180,000 note. Evidence abounded that the natural consequence of Castiglia's deceitful and dishonest handling of bank funds was to put BONY in jeopardy of loss.

We have carefully considered appellants' other arguments and find them without merit. Accordingly, the judgments of conviction are affirmed.

WINTER, Circuit Judge, concurring in part and dissenting in part:

I concur in affirming Castiglia's conviction for false statements on the bank questionnaires and in Liffiton's conviction for perjury. However, I respectfully dissent from the various convictions for conspiracy, for the misapplication of bank funds, for the making of false entries in bank records concerning the loans in question, and for aiding and abetting the misapplication and false entries.

The sole reason for my dissent is my inability to reconcile the present decision with that in *United States v. Docherty*, 468 F.2d 989 (2d Cir.1972) (Friendly, C.J.), which reversed a conviction for aiding and abetting the misapplication of bank funds and making of false statements in factual circumstances identical to the present case. In *Docherty*, one Evans, a bank officer, persuaded a credit-worthy friend, Docherty, to obtain loans in Docherty's name from the bank to be given to Evans who promised Docherty that he, Evans, would repay

them. Evans told Docherty that this arrangement was necessary because the bank would not lend its funds to an officer and frowned upon officers borrowing from other banks. Docherty gave Evans the coupon book, and Evans undertook to repay the bank directly. 468 F.2d at 991.

*Docherty* held that the defendant's failure to disclose the real recipient of the loan, and in one instance stating that the loan's purpose was "personal," did not violate the prohibition on false statements. *Id.* at 992. It further held that "knowledge that the proceeds of the loans were going into Evans' hands in violation of the bank's internal rules," *id.* at 993, was not enough to constitute aiding and abetting of the misapplication of bank funds, *id.* at 995. The basis for this latter holding was the majority's conclusion that there was no proof that Docherty intended to injure the bank because he "knew he was putting his own credit on the line, and it [was] not suggested that he lacked the means to repay." *Id.*

The facts in the instant case are identical. Santiago was eminently credit-worthy. He had previously borrowed millions of dollars from the bank, and Castiglia was within his authority in lending the $580,000 to Santiago on his signature. The government never suggested to the jury and has not suggested to us that Santiago's obligation to the bank was invalid. In his summation, the prosecutor characterized the transaction as a loan by the bank to Santiago and a "reloan" by Santiago to Castiglia. *See, e.g.,* Trial Transcript at 22–66 (Sept. 20, 1988). When Santiago instructed his bookkeeper to put the note in Castiglia's file, Santiago wrote a notation on the note indicating that Castiglia was going to send a life insurance policy with Santiago as beneficiary in the amount of $580,000. Later, when his accountant indicated to Santiago that he might have insufficient documentation to hold Castiglia liable if the note was unpaid, Castiglia was made to sign a promissory note for the unpaid balance and thereafter made the payments to Santiago who passed them on to the bank. Santiago's credit was thus

"on the line." *See Docherty*, 468 F.2d at 995.

The purported distinction relied upon by my colleagues is that in *Docherty* the money was "reloan[ed]" to the bank officer whereas in the instant matter the borrower was told, in the words of my colleagues, "that he would not be looked to for repayment." The same statement could as well describe the borrower in *Docherty*, who gave Evans the coupon book with the expectation that Evans would repay the bank directly. The distinction relied upon by my colleagues thus escapes me. It also escapes the government, which at trial explicitly characterized the transactions as a loan to Santiago and a "reloan" to Castiglia. Finally, the distinction escapes the accountant whose testimony is the basis for my colleagues' conclusion that Santiago was told he "would not be looked to for repayment." [1] The accountant also treated the transactions as a loan to Santiago and reloan to Castiglia and therefore caused Castiglia to sign a formal note.

Confusion is certain to emanate from the present decision. In future cases, prosecutors will avoid the word "reloan" and elicit testimony from a witness that the borrower was assured that he or she would "not be looked to for repayment." Defense attorneys will get the same witness to describe the transaction as a "reloan." Any such witness, of course, like the accountant in the instant case, will understandably and correctly believe the words to mean the same thing, but district judges will then have to charge the jury that they must convict in one case but not in the other. I shrink from speculating about the result on appeal.

The actual distinction drawn by the cases, of course, is between assurances by a bank officer that the borrower will not be looked to for repayment because the officer will repay and a similar officer who gives assurances that *the bank* will not look to the borrower if the loan is not repaid. My colleagues rely heavily upon a quotation from *United States v. Gens*, 493 F.2d 216 (1st Cir.1974), indicating that a misapplication will be found where "bank officials assured the named debtor ... that they would look for repayment only to the third party who actually received the loan proceeds." *Id.* at 222. However, the government never claimed in the instant case that Santiago was told, much less believed, that *the bank* would not enforce the note against him. Santiago was himself in part a money lender, and the government in no way suggests that he had, or thought he had, any defense under New York law to a suit against him by the bank if the note was not paid. Indeed, although Santiago took measures to conceal the real nature of the transaction, his behavior with regard to the life insurance policy and Castiglia's later execution of a formal note clearly indicate that Santiago believed he was liable on the note if unpaid. Indeed, the government's brief describes the cause of the execution of that note by Castiglia as follows: "Santiago now *owned* [sic] money on the other loan—and immediately looked to Castiglia for payment." (Emphasis added). Brief of Appellee at 17.

The fact that Castiglia and Santiago and Liffiton engaged in devious behavior in transferring the funds is irrelevant under *Docherty*. Santiago and Liffiton may have helped Castiglia to conceal his outside employment from the bank, but that is not enough under *Docherty* to prove an intent to injure the bank through a misapplication of funds. Judge Friendly expressly stated in that case that knowledge that a loan may violate a bank rule will not support a conviction for aiding and abetting under Section 656, 468 F.2d at 993, where the borrower puts "his own credit on the line, and it is not suggested that he lacked the means to repay," *id.* at 995.

---

1. The accountant's actual testimony was as follows:

Q. Do you recall the content of that conversation you had with Mr. Santiago on this subject?

A. In essence, I was inquiring as to his recollection as to what had transpired, when he borrowed the money, how he did, for what purpose, general conversation to try to record the transaction.

Q. Did he respond to you?

A. Yes, he did.

Q. What did he say?

A. He asked me to contact Peter Castiglia. He borrowed the money from the bank for Peter Castiglia and he took care of all the transactions.

Q. He meaning whom?

A. Mr. Castiglia.

Q. Did he make any remark at all as to who was responsible for repayment?

A. Yes.

Q. What did he say?

A. He indicated that Mr. Castiglia was responsible.

Trial Transcript at 7–227 (Aug. 24, 1988).

Having said all this because I simply cannot reconcile *Docherty* and the instant case, I will confess some uneasiness with the *Docherty* holding because, as foreshadowed by Judge Lumbard's dissent, it carries with it implications for principals as well as aiders and abettors. Judge Lumbard noted in that dissent that if the borrower knows that the loan is in his name solely as a means of avoiding bank rules concerning loans to officers and if that conduct is not enough to prove an intent to injure the bank, then the officer as well as the aider and abettor will escape liability. 468 F.2d at 996–97 (Lumbard, J., dissenting). It may be, as the government has stipulated, that Santiago's wealth eliminated any practical risk to the bank in this transaction, and it may also seem harsh to charge someone who has put his own wealth at risk to the bank with criminal conduct injuring the bank. But that conduct surely facilitated a bank officer's knowing evasion of common and necessary bank rules designed to prevent misapplication of bank funds. I am thus far from certain that Castiglia has not violated Section 656 and the false entries statute in the instant case. Precedents from other circuits collected in footnote 5 of Judge Kaufman's opinion hold that such conduct by a bank officer is criminal. However, if Castiglia did violate the statute, then Santiago and Liffiton surely aided and abetted him.

Had my colleagues sought to overrule *Docherty*, either by an *in banc* decision or through our informal practice of circulation before publication to allow our colleagues to comment or seek an *in banc* ruling, *see United States v. Reed*, 773 F.2d 477, 478 n. 1 (2d Cir.1985), I might have agreed with them on the merits. Because they have chosen to leave *Docherty* in place, with the confusion that will surely follow, I therefore have no choice but to dissent.

Because Castiglia's conviction for false statements on the bank questionnaires and Liffiton's conviction for perjury are unrelated to the ground for my dissent, I concur in their affirmance. I dissent from the convictions on the other counts for the reasons stated. A final comment on the conspiracy count is necessary. That count included: (i) Castiglia's false statements on the questionnaire; (ii) the failure to disclose Castiglia as the ultimate recipient of the loan proceeds on the loan documents, and (iii) the misapplication of bank funds. Because there were no special verdicts, we cannot tell whether the jury found that the defendants were guilty as to (i) above, a conviction I would be willing to affirm. I would therefore remand the conspiracy count for a retrial.

Opinion on Petition for Rehearing

PER CURIAM:

The petition for rehearing is denied. Congressional action to restrict the circumstances under which a bank may make loans to its officers, *see* 12 U.S.C. § 375b (1988), has cast substantial doubt on whether *United States v. Docherty*, 468 F.2d 989 (2d Cir.1972), would be decided the same way today. *See* pg. 537 n. 5. To whatever extent language in *Docherty* might appear to be in conflict with our decision in *Castiglia*, our current views, informed by Congressional action, control. This opinion has been circulated to all active judges of this court prior to filing.