UNITED STATES of America, Appellee,

v.

Thomas J. McELROY, Jr., and Robert H. Stedman, Defendants–Appellants.

Nos. 1273, 1274, Dockets 90–1040, 90–1041.

United States Court of Appeals, Second Circuit.

Argued May 29, 1990.

Decided July 31, 1990.

---

1018

George J. Terwilliger, III, U.S. Atty., D. Vt., and John–Claude Charbonneau, Asst. U.S. Atty., Rutland, Vt., for appellee.

John J. Kennelly, Rutland, Vt. (James P. Carroll, Alan B. George, Carroll, George & Pratt, Rutland, Vt., on the brief), for defendant-appellant Thomas J. McElroy, Jr.

Stephen Alan Dardeck, Rutland, Vt. (Michael C. Pratt, Tepper & Dardeck, Rutland, Vt., on the brief), for defendant-appellant Robert H. Stedman.

Before LUMBARD, KEARSE, and MINER, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Thomas J. McElroy, Jr., and Robert H. Stedman appeal from judgments entered in the United States District Court for the District of Vermont, following a jury trial before Lee P. Gagliardi, *Judge,* convicting each of them on one count of conspiracy to misapply bank funds, in violation of 18 U.S.C. §§ 371 and 656 (1988), several counts of misapplication of bank funds, in violation of 18 U.S.C. § 656, and several counts of giving and receiving bribes, in violation of 18 U.S.C. §§ 215(a)(1) and (2) (1988). Each defendant was sentenced to, *inter alia,* 37 months' imprisonment, to be followed by two years' supervised release, and ordered to make restitution to the victims of their offenses. On appeal, they contend principally (1) that § 215(a), as applied to them, is unconstitutionally vague; and (2) that the district court (a) did not properly take account of the overlap in the charges against them, (b) made several erroneous rulings at trial, and (c) erred in calculating their sentences. For the reasons below, we affirm the judgments of conviction.

## I. BACKGROUND

At all relevant times, McElroy was Chief Executive Officer of Marble Bank ("Marble"), and Stedman was President of First Twin State Bank ("First Twin"). Taken in the light most favorable to the government, the trial evidence established the following.

### A. *The Reciprocal Lending Scheme*

Marble and First Twin were Vermont banks insured by the Federal Deposit Insurance Corporation ("FDIC"). Under the banks' respective loan policies, neither McElroy nor Stedman was allowed to borrow from his own bank without the approval of the bank's board of directors. *See also* 12 U.S.C. § 375b (1982) (loans in excess of a certain amount to executive officers of federally insured bank must be approved in advance by board of directors).

In November 1986, McElroy applied to Numerica Savings Bank ("Numerica") for an unsecured personal line of credit in the amount of $550,000. McElroy sought the loan in order to purchase stock in New England banks on margin. Numerica denied this application because, *inter alia,* McElroy's financial condition was already highly leveraged, and his income was insufficient to service his projected debt. The Numerica witnesses, referring to the Federal Reserve Board's Regulation U, 12 C.F.R. Pt. 221 (1990) ("Regulation U"), a regulation that essentially prohibits banks from extending margin credit in excess of 50% of a stock's current market value, also testified that McElroy's application was denied in part because the purpose of the loan was bank stock speculation.

Upon the rejection by Numerica, McElroy contacted Stedman to seek a loan from First Twin. Stedman too was interested in speculating in New England bank stocks, and he and McElroy entered into an arrangement by which each defendant would cause his own bank to give the other defendant large unsecured loans for the purpose of bank stock speculation. There followed several reciprocal loans, all occurring in 1987. On January 6 and 12, Stedman caused First Twin to lend McElroy $200,000 and $100,000, respectively; on January 7, McElroy caused Marble to lend Stedman $300,000. On September 8, Stedman caused First Twin to lend McElroy $125,000; on September 23, McElroy caused Marble to lend Stedman $150,000. On October 29, Stedman caused First Twin to lend McElroy $200,000; on November 2, McElroy caused Marble to lend Stedman $200,000. In sum, McElroy caused Marble to make three loans to Stedman totaling $650,000, and Stedman caused First Twin to make four loans to McElroy totaling $625,000. In addition to these new loans, each defendant granted the other four loan renewals (including "rollover" loans), the reciprocal renewals generally occurring within one day of each other. Thus, on May 6, Stedman renewed the $300,000 in loans to McElroy, and on May 7, McElroy renewed the $300,000 loan to Stedman; on September 3, Stedman again renewed the $300,000 in loans to McElroy, and on September 4, McElroy renewed the $300,000

loan to Stedman; on October 9, Stedman renewed the $125,000 loan to McElroy, and on October 16, McElroy granted Stedman a $130,000 loan renewal; and on November 23, Stedman granted McElroy a $125,000 loan renewal, and McElroy granted Stedman a $129,750 loan renewal.

McElroy did not report the Stedman loans to the Marble board of directors; nor did he inform the board of his borrowings from Stedman's bank. Similarly, Stedman did not inform the First Twin board of either his approval of the loans to McElroy or his borrowings from McElroy's bank. Numerous witnesses, including bankers and state and federal bank regulators, testified that given the facts that, *inter alia,* the respective net worths of McElroy and Stedman at the time of the loans were less than the amounts loaned and that the loans were totally unsecured and were for the purpose of bank stock speculation, both sets of loans were improvident and unwarranted.

The reciprocal loans were discovered by FDIC examiners in the course of routine audits and follow-up investigations that began in November 1987. Examiners auditing First Twin noted the loans to McElroy shown on that bank's books and the large contemporaneous deposits made to Stedman's personal account. This led to further investigation at Marble and the discovery of the other half of the arrangement. Both FDIC and state banking authorities concluded that the loans could not be explained on the basis of prudent banking principles and that the reciprocal lending relationship had colored the judgment of McElroy and Stedman in making the loans.

B. *The Charges, the Verdicts, and the Sentences*

McElroy and Stedman were charged in a 46–count indictment. Count 1 charged them with conspiring to misapply the funds of their respective banks, in violation of 18 U.S.C. §§ 371 and 656. With respect to the seven loans or loan renewals from Marble to Stedman, McElroy was charged with seven counts of willfully misapplying Mar-

ble's funds, in violation of 18 U.S.C. § 656 (counts 40–46), and seven counts of corruptly giving a thing of value to Stedman to induce his approval of the loans from First Twin, in violation of 18 U.S.C. § 215(a)(1) (counts 18–24); and Stedman was charged with seven counts of corruptly accepting, as a bank officer, a thing of value as inducement for approving the First Twin loans to McElroy, in violation of 18 U.S.C. § 215(a)(2) (counts 25–31). With respect to the eight loans or loan renewals from First Twin to McElroy, Stedman was charged with eight counts of willfully misapplying First Twin's funds, in violation of 18 U.S.C. § 656 (counts 32–39), and eight counts of corruptly giving a thing of value to McElroy as inducement for his approval of the Marble loans, in violation of 18 U.S.C. § 215(a)(1) (counts 2–9); and McElroy was charged with eight counts of corruptly accepting, as a bank officer, a thing of value as inducement for his approval of Marble's loans to Stedman, in violation of 18 U.S.C. § 215(a)(2) (counts 10–17).

The jury found McElroy and Stedman guilty on all counts. The district court imposed sentences that included prison terms, periods of supervised release, orders to pay restitution to the victimized banks, and special statutory assessments. Applying the federal Sentencing Guidelines ("Guidelines") to the conspiracy count and to those substantive counts that focused on loan transactions occurring after November 1, 1987 (collectively "Guidelines counts"), the court determined that the offense level for each defendant was 21, for which the prescribed range of imprisonment was 37 to 46 months. The court sentenced each defendant to concurrent 37–month prison terms on Guidelines counts. As to the remaining counts, the court imposed 37–month terms of imprisonment, to run concurrently with each other and with the sentences imposed on Guidelines counts. Each defendant's prison term was to be followed by two years' supervised release. In addition, McElroy was ordered to make restitution to First Twin in the amount of $512,243.30; Stedman was ordered to make restitution to Marble in the

amount of $387,704.35. These appeals followed.

## II. DISCUSSION

On appeal, McElroy and Stedman contend principally (1) that the bank bribery statute, § 215(a), is unconstitutionally vague as applied to them; and (2) that the district court (a) did not take proper account of the overlap in the charges under §§ 215(a)(1), 215(a)(2), and 656, (b) erred in allowing or excluding various items of evidence and in making several other trial rulings, and (c) erred in calculating their offense levels under the Guidelines. Their arguments are without merit.

### A. *The Constitutionality of § 215(a)*

■ The bank bribery statute, as amended in 1986, provides, in pertinent part, that whoever

> (1) corruptly gives, offers, or promises anything of value to any person, with intent to influence or reward an officer ... of a financial institution in connection with any business or transaction of such institution; or

> (2) as an officer ... of a financial institution, ... corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution

is guilty of a felony. 18 U.S.C. § 215(a). In amending this section in 1986, Congress directed that the appropriate federal agencies "establish such guidelines as are appropriate to assist an officer ... to comply with this section," and "make such guidelines available to the public," *id.* § 215(d). No guidelines were published by FDIC until November 17, 1987, *see* 52 Fed.Reg. 43,939 (1987), and defendants contend that prior to that publication they were not given constitutionally adequate notice that their actions were prohibited. We disagree.

A penal statute is not unconstitutionally vague if it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Vagueness challenges outside the context of the First Amendment are to be examined in light of the facts of the case, on an as-applied basis. *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 319–20, 46 L.Ed.2d 228 (1975); *see also United States v. National Dairy Products Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 597–98, 9 L.Ed.2d 561 (1963) ("[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed"; sufficiency of notice is to be determined by "examin[ing the statute] in the light of the conduct with which a defendant is charged").

■ The conduct prohibited by § 215(a), which is limited to acts that are done "corruptly," is described in sufficiently plain terms to permit an ordinary person to understand what conduct is prohibited. Giving and accepting things of value are not vague concepts. The term "corruptly" is ordinarily understood as referring to " 'act[s] done voluntarily and intentionally and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means. The motive to act corruptly is ordinarily a hope or expectation of either financial gain or other benefit to oneself or some profit or benefit to another.' " *United States v. Brunson,* 882 F.2d 151, 154 n. 2 (5th Cir.1989) (quoting district court's instructions with respect to § 215(a)).

There can be little doubt that the acts of McElroy and Stedman were acts prohibited by § 215(a)(1) and (2). Each granted the other large, unsecured, improvident bank loans in order to receive large unsecured loans from the other's bank. Further, there was adequate proof that these acts were done corruptly. Both men desired large unsecured loans for purposes of speculation; neither could obtain such loans from his own bank without the approval of his board of directors. Neither man informed his bank's board of directors of

either his own loans from the other bank or the loans to the other defendant. A reciprocal loan arrangement designed to circumvent the approval requirements for self-lending and to achieve what could not legitimately be done without the board approvals fell plainly within the scope of § 215(a).

The jury was properly instructed as to the meaning of the term "corruptly." We conclude that an ordinary person would have understood that § 215(a) applies to the acts at issue here and that the application was neither arbitrary nor capricious.

Finally, we note that McElroy also challenges the constitutionality of § 656, which, to the extent pertinent here, makes it a crime for any bank officer to "willfully misappl[y]" bank funds. This challenge is foreclosed by our decision in *United States v. Fortunato*, 402 F.2d 79, 81 (2d Cir.1968) ("statutory concept of misapplication is not a vague word of ... uncertain application" and encompasses causing bank "loan to be made to [officer's] own benefit, concealing his interest from the bank"), *cert. denied*, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969); *accord United States v. Cooper*, 464 F.2d 648, 652–53 (10th Cir.1972), *cert. denied*, 409 U.S. 1107, 93 S.Ct. 902, 919, 921, 34 L.Ed.2d 688 (1973).

### B. *The Alleged Overlap of the Charged Offenses*

Defendants contend that the district court failed to take proper account of the overlapping charges against them in two respects. First, each defendant contends that it was improper to convict him under both § 215(a)(1) and § 215(a)(2) for any given set of reciprocal loans. Second, each contends that he could not properly be convicted of offenses under both § 215(a) and § 656 because the latter are lesser included offenses of the former. Though there plainly was some overlap here because of the nature of the conduct, we disagree with both contentions.

#### 1. Section 215(a)

■ When a borrower corruptly gives a thing of value to a bank officer in order to influence him to approve a loan from the

bank, and the officer corruptly accepts that valuable intending to be so influenced, the borrower violates § 215(a)(1), and the officer violates § 215(a)(2). Thus, under the terms of § 215(a), in each such transaction, each of these persons has committed an offense. Where the valuables consist of loans approved by the borrower, himself a bank officer, from his own bank to the officer of the first bank, a second set of transactions has occurred, and in each such transaction, each person has similarly committed an offense. Defendants' contention that no additional liability should attach from the addition of this second set of transactions, in which the borrower and the banker exchange roles and a second bank is put at risk, is unsupported by the language or intent of § 215(a) or by logic.

#### 2. Section 656

■ We also reject defendants' contention that § 656 sets forth a lesser included offense of § 215(a). For one offense to be "included" in a second offense, all of the elements of the first offense must be elements of the second. *United States v. Giampino*, 680 F.2d 898, 901 (2d Cir.1982); *United States v. Twiford*, 600 F.2d 1339, 1342 (10th Cir.1979). When the first offense requires proof of an element that the second offense does not, the first cannot be a lesser included offense of the second.

■ Section 656 provides, in pertinent part, that "[w]hoever, being an officer, director, agent or employee of, or connected in any capacity with ... [an] insured bank, ... willfully misapplies any of the moneys, funds or credits of such bank," is guilty of a felony. 18 U.S.C. § 656. Establishment of a violation of this part of § 656 thus requires proof, *inter alia*, that the person who misapplied the bank funds was an officer, director, etc., of the bank. In contrast, § 215(a)(1), whose terms are quoted in Part II.A. above, contains no such requirement; the giver of a bribe in violation of § 215(a)(1) need have no connection with the bank whose officer is bribed. Thus, § 656 is not a lesser included offense of § 215(a)(1).

Nor is § 656 included within § 215(a)(2), for the former requires proof of actual misapplication of bank funds, whereas the latter section may be violated by a bank officer's receipt of a bribe with the intent to be influenced, regardless of whether the bribe results in any misapplication or other transfer of the bank's funds. Thus, the § 656 offense is not included in § 215(a).

Similarly, since §§ 215(a)(1) and (2) contain elements that are not found in § 656 (*e.g.*, proof of a bribe paid to a bank officer), neither § 215(a) offense is included in § 656. *See United States v. Twiford,* 600 F.2d at 1342–43.

In sum, none of the offenses with which McElroy and Stedman were charged was a lesser included offense of any other.

### C. *Challenges to Evidentiary Rulings*

Defendants challenge several of the trial court's evidentiary rulings. They contend, *inter alia,* that the court erred in allowing (a) evidence of the Numerica denial of McElroy's loan application and (b) mention of Federal Reserve Board Regulation U. They also contend that the court erred in excluding relevant evidence concerning (a) other First Twin loans approved by Stedman, and (b) loan repayments by Stedman through the time of trial.

▪ Evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Under Rule 403, relevant evidence may be *excluded* if its probative value is substantially outweighed by the danger that it will be unduly prejudicial, confusing, or misleading to the jury. Fed.R.Evid. 403. The trial judge may also exclude or limit relevant evidence if he concludes that its probative value is outweighed by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Id.* The trial court's balancing of these factors will not be disturbed on appeal absent an abuse of discretion. *See, e.g., United States v. Robinson,* 560 F.2d 507, 514–15 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct.

1451, 55 L.Ed.2d 496 (1978); *United States v. Dwyer,* 539 F.2d 924, 927 (2d Cir.1976). We conclude that the court did not abuse its discretion in making any of the challenged rulings.

#### 1. The Numerica Evidence and Regulation U

▪ The evidence that McElroy applied to Numerica for a $550,000 loan to finance his speculation in bank stocks and was rejected because of his financial condition and his speculative purpose showed that his application was viewed by independent bankers as unsound. The evidence was relevant to the charges against McElroy because it tended to show McElroy's motive in entering into a nefarious scheme to use his own bank's funds in order to obtain loans from First Twin. Given the view of independent bankers that the loans to McElroy were imprudent, the evidence was also relevant to the charges against Stedman because it tended to show that Stedman's approval of these loans was influenced by his reciprocal arrangement with McElroy.

We see no basis for overturning the trial court's assessment that the Numerica rejection would not be misleading or confusing to the jury and that it would not be unfairly prejudicial. We conclude that its decision to admit the Numerica evidence was not an abuse of discretion.

▪ Nor was it an abuse of discretion to permit the Numerica officers, in explaining that bank's rejection of McElroy's application, to refer to Regulation U. That regulation prohibits a bank from lending money for the purchase of stock on margin where the amount of the loan would exceed 50% of the stock's current market value. *See* 12 C.F.R. Pt. 221. Though references to such a regulation would be improper if their purpose or effect were to suggest to the jury that it could find the defendant guilty simply by reason of his violation of the regulation, *see United States v. Wolf,* 820 F.2d 1499, 1505 (9th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988); *United States v. Ste-*

*fan,* 784 F.2d 1093, 1098–99 (11th Cir.), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986); *United States v. Christo,* 614 F.2d 486, 492 (5th Cir.1980), that was neither the purpose nor the suggestion here. Reference to Regulation U served to explain the basis for Numerica's lending policies and creditworthiness determinations as they related to McElroy's loan application. The court took care to instruct the jury that a violation of Regulation U would "not amount to criminal conduct under federal law," and with this limiting instruction, it was well within the court's discretion to allow the evidence.

### 2. The Evidence of Stedman's Lending Style

█ Stedman offered proof at trial that he had approved other risky loans, contending that proof of his "aggressive lending style" would negate the government's argument that his approval of loans to McElroy was motivated by self-interest. The district court refused to allow him to present the details of such loans, and defendants contend that this was error. We find no abuse of discretion in the trial court's handling of this matter.

The court did not exclude all evidence of Stedman's lending style. It allowed Stedman to present evidence regarding his general lending style during cross-examination of several witnesses, including (a) Stedman's successor at First Twin, (b) the president of First Twin's parent company, and (c) an outside auditor. All of these witnesses testified that Stedman was "aggressive" in making loans and explained that this meant he might approve loans that might well be rejected by other banks. What the court refused to allow was proof of "all the facts and circumstances of ... individual loans." We see no abuse of discretion in the court's assessments that it was sufficient to allow the more general proof of the aggressiveness of Stedman's style and that the probative value of the details of individual loans would be outweighed by considerations of delay, waste of time, or their cumulative nature.

### 3. Stedman's Subsequent Loan Repayments

█ At trial, defendants sought to introduce evidence of Stedman's repayments on his Marble loans through the date of trial, arguing that repayment was inconsistent with any intent to injure the banks. The court allowed evidence of repayments made prior to the discovery of the loans by the bank examiners, but it excluded proof of payments made thereafter on the ground that the later payments went not to intent but to lack of injury to the banks. The court viewed lack of injury as irrelevant under the statutes in question, and it noted that such proof would likely lead to confusion. Defendants contend that the exclusion of this evidence was reversible error. We disagree.

Though establishment of an offense under § 656 requires proof of "an intent to injure, defraud, or deceive the bank," *United States v. Castiglia,* 894 F.2d 533, 537 (2d Cir.1990) ("*Castiglia*"), *cert. denied,* — U.S. ——, 110 S.Ct. 3238, 111 L.Ed.2d 749 (1990); *see United States v. Docherty,* 468 F.2d 989, 994–95 (2d Cir.1972); *United States v. Cleary,* 565 F.2d 43, 47–48 (2d Cir.1977), *cert. denied,* 435 U.S. 915, 98 S.Ct. 1469, 55 L.Ed.2d 506 (1978), evidence of lack of injury is generally immaterial. "If the 'natural effect' of [the defendant's] conduct put [the bank] in jeopardy of loss, there was an intent to injure or defraud. Whether [the bank] suffered any actual loss is of little importance." *Castiglia,* 894 F.2d at 537–38; *see also United States v. Sindona,* 636 F.2d 792, 800–01 (2d Cir. 1980), ("*Sindona*"), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). In *Sindona,* the defendant was charged with, *inter alia,* violation of § 656 arising out of a scheme to extract moneys from a bank fraudulently, and he sought to show that he had had another entity, "Interbanca," make a partial repayment. We approved the district court's exclusion of the repayment evidence, noting that

[t]he only probative value associated with the repayment ... would either be to show that [the bank] suffered no loss or that in 1972 Sindona did not intend to misapply [the bank's] funds. In *United*

*States v. Fortunato,* 402 F.2d 79 . . . we held that . . . loss to the victim need not be shown in order to prove a violation. Thus, an absence of loss to [the bank] is irrelevant. The repayment by Interbanca as evidence of Sindona's 1972 intent is similarly irrelevant. "The offense occurred and was complete when the misapplication took place. What might have later happened as to repayment is not material and could not be a defense." *Id.* at 800 (quoting *United States v. Acree,* 466 F.2d 1114, 1118 (10th Cir.1972)). The conclusion of the district court in the present case that evidence of repayment is generally irrelevant was thus in accord with *Castiglia* and *Sindona.*

Neither *United States v. Cleary* nor *United States v. Docherty* required the contrary conclusion with respect to Stedman. In *Cleary,* the banker defendant had approved loans to certain borrowers while knowing the proceeds were to go to a third party. There was no evidence, however, that the banker had received anything of value in exchange for granting the loans, and we noted, therefore, that "loans of this character are improper [under § 656] only if the lending officer had no reason to expect that the named debtor would repay them. . . ." 565 F.2d at 47. In that context, we ruled that the matter of repayments was relevant to the element of intent, but we noted that "[o]nce the Government has established a defendant's intent to defraud and the misapplication of funds, the success or failure of his efforts may be immaterial. . . ." *Id.* The facts of *Cleary,* in which the defendant had received nothing of value, are clearly distinguishable from those of the present case, in which each defendant received hundreds of thousands of dollars.

*Docherty,* whatever its continued viability in light of this Court's more recent decision in *Castiglia,* 894 F.2d at 540 ("Congressional action to restrict the circumstances under which a bank may make loans to its officers . . . has cast substantial doubt on whether *United States v. Docherty* . . . would be decided the same way today."), is likewise inapposite. In *Docherty,* the defendant was a borrower who did not disclose that the proceeds of his loans were to be given to his close friend, an officer of the bank. He was convicted of conspiring with his friend to violate § 656 and of aiding and abetting his friend's violation of that section. We noted that Docherty was liable on the loans and had never sought to escape that liability, and we concluded that the convictions must be reversed because there was not sufficient evidence of the requisite intent. We did not suggest that the convictions were to be reversed because of lack of actual injury.

In the present case, there was ample evidence of the intent of McElroy and Stedman to deceive their respective banks, including the failure of each to disclose to his board of directors either his own borrowing or the loans to the other. *See, e.g., Castiglia,* 894 F.2d at 537 n. 5 ("misapplication occurs whenever a bank officer knowingly causes a 'loan to be made to his own benefit, concealing his interest from the bank' " (quoting *United States v. Fortunato,* 402 F.2d at 81)). Further, the natural effect of granting large, improvident loans without security was to place the bank at substantial risk. It was well within the discretion of the trial court to conclude that the evidence of Stedman's repayments after FDIC discovered the arrangement was not sufficiently relevant to the defendants' intent at the time the loans were made but rather went to lack of injury, and to exclude that evidence.

### D. Challenges to Other Trial Rulings

McElroy contends that the court erred in not instructing the jury that it should acquit him if it found he had made the loans to Stedman in good faith. Stedman contends that the court erred in refusing to reread his cross-examination of McElroy to the jury. Neither contention merits extended discussion.

#### 1. The Refusal to Give a "Good Faith Defense" Instruction

McElroy asked the court to instruct the jury that he could not be found guilty on the bribery and misapplication

counts if he had acted in good faith. The court declined to charge in that language. Instead, as to § 215(a), the court instructed the jury that it could not convict either defendant of bribery unless it was convinced beyond a reasonable doubt that he had acted "corruptly, with intent to influence or reward an officer ... of a financial institution"; the court advised the jury that "[a]n act is done corruptly if done voluntarily and intentionally and with the bad purpose of accomplishing an unlawful result or to accomplish a lawful result by unlawful means or method." With respect to the § 656 charges, the court instructed the jury that the government was required to prove that the defendants had acted "with intent to defraud the bank," i.e., "with intent to deceive or cheat[,] ordinarily for the purpose of causing a financial loss to someone else or bringing about a financial gain to oneself."

These instructions conveyed the essence of a "good faith defense" instruction, and the court's refusal to give the requested instruction provides no basis for reversal. See United States v. McGuire, 744 F.2d 1197, 1201–02 (6th Cir.1984), cert. denied, 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 159 (1985); see also United States v. Nivica, 887 F.2d 1110, 1124–25 (1st Cir.1989), cert. denied, — U.S. —, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990).

### 2. The Rereading of McElroy's Cross–Examination

 Stedman contends that he is entitled to a new trial because the court improperly refused to allow his cross-examination of McElroy to be reread to the jury. The background of this contention is as follows.

McElroy testified at trial in his own behalf. He was cross-examined first by the government and then by Stedman. During its deliberations, the jury sent the trial judge a note stating, "We request McElroy's testimony." After consulting with the parties, the trial judge sent the jury a note asking, "Is there any particular part of the testimony you wish reread? If so, please inform us. Or do you want his

entire testimony reread?" Responding to these questions in reverse order, the jury foreperson wrote back, "No, not at this point. Cross examination portion of the testimony." When the jury was brought into the courtroom, the trial judge stated, "Your note indicated to me that you wished at this point to have the cross examination of Mr. McElroy reread to you; is that correct?" The foreperson responded, "That's correct." The court then had the government's cross-examination read and asked, "Is that what you requested?" The foreperson responded, "Yes," and the jury nodded affirmatively.

Stedman objected that he too had cross-examined McElroy and he sought to have his examination reread to the jury. The court refused, noting that the jury had stated that the portion it wanted had been reread.

Whether to allow testimony to be reread to the jury is a matter committed to the sound discretion of the trial court, see United States v. Parker, 903 F.2d 91, 102 (2d Cir.1990); United States v. Damsky, 740 F.2d 134, 138 (2d Cir.), cert. denied, 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984), and there plainly was no abuse of discretion here. The jury's written response to the court's query was ambiguous, and the trial judge gave it a reasonable interpretation in rereading the cross-examination by the government and asking if that was what the jury wished to hear. In light of the jury's affirmative answer, the court was well within the bounds of discretion in declining to have more reread.

### E. Sentencing

In calculating each defendant's offense level under the Guidelines, the district court determined, inter alia, that his offense conduct should be divided into two groups: first, misapplication of bank funds, in violation of § 656, together with the giving of bribes, in violation of § 215(a)(1), and conspiracy; and second, the acceptance of bribes, in violation of § 215(a)(2). In addition, the court ruled that the offense levels should be increased because defendants had abused their positions of trust in

order to facilitate their crimes. Defendants challenge both of these rulings.

In reviewing a sentencing court's application of the Guidelines, we must "accept the findings of fact of the district court unless they are clearly erroneous and ... give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e) (1988). We will not overturn the court's application of the Guidelines to the established facts unless there has been an abuse of discretion. *See United States v. Parker*, 903 F.2d 91, 103 (2d Cir.1990). In the present case, we find no clear error and no abuse of discretion.

## 1. The Grouping of Offenses

■ Each defendant contends that under Guidelines § 3D1.2(d), the court should have grouped all of his offenses together, rather than dividing them into two groups. We disagree.

Section 3D1.2 directs that "[a]ll counts involving substantially the same harm ... be grouped together into a single Group." Counts are deemed to involve substantially the same harm "if the offense level is determined largely on the basis of the total amount of harm or loss, ... or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." *Id.* § 3D1.2(d). Specifically included under this subsection are offenses covered by Guidelines § 2B4.1 and § 2B1.1, which respectively give the base offense levels for violations of the bank bribery statute and the misapplication of bank funds statute. The commentary to § 3D1.2 states that "most property crimes ... are to be grouped together," *id.* § 3D1.2 Application Note 6, and where the same property is the subject of multiple counts, grouping is appropriate, *see United States v. Cain*, 881 F.2d 980, 982–83 (11th Cir.1989) (per curiam) (possession and concealment counts relating to same stolen checks should be grouped together under § 3D1.2(d)).

In keeping with this commentary, the district court rejected the Presentence Report's recommendation that the offenses be placed in three groups—(1) misapplication

in violation of § 656 and conspiracy to misapply, (2) giving bribes in violation of § 215(a)(1), and (3) accepting bribes in violation of § 215(a)(2)—and determined instead to place each defendant's misapplication-of-bank-funds and conspiracy offenses in the same group with his § 215(a)(1) offenses of lending his bank's funds as a bribe. This grouping was appropriate because, as to a given defendant, these categories of offenses involved the same property and the same bank as victim. The court was not, however, required to view that defendant's *acceptance* of bribes in the form of loans from the *other* bank as part of the first offense group. The loans from the other bank did not involve either the same property or the same victim.

We defer to the district court's determination that the Guidelines should be applied so as to divide each defendant's offenses into two groups, rather than one or three.

## 2. Abusing Positions of Trust

■ Section 3B1.3 of the Guidelines provides for a two-level upward adjustment in offense level "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." Such an adjustment is not to be made, however, "if an abuse of trust or skill is included in the base offense level or specific offense characteristic." *Id.* Defendants contend that since § 656 applies to a willful misapplication of funds only by persons connected with a bank, abuse of trust is included in the base offense level because it is an element of the offense, and the court's upward adjustment of their respective offense levels for abuse of trust was therefore improper. Again, we disagree.

First, § 656 applies to any person who is "an officer, director, agent or employee of, or connected in any capacity with" a federally insured bank. Since not all of these positions are necessarily positions of trust, abuse of trust is not necessarily a part of the offense. Second, it is clear that in the present case, defendants used their positions as the chief officers of their respective banks to facilitate their misapplications

of bank funds in ways that many lower-level officers, or employees, or those connected with the bank in some capacity other than officer, director, employee, or agent, could not have done. We conclude that the court did not abuse its discretion in determining that the Guidelines provision for increasing the offense level for abuse of trust applied to the conduct of these defendants.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found them to be without merit. The judgments of conviction are affirmed.