Allan HUTENSKY, Petitioner,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.

No. 803, Docket 95–4087.

United States Court of Appeals, Second Circuit.

Argued March 6, 1996.

Decided April 19, 1996.

Lisa C. Goodheart, Hill & Barlow, Boston, MA (Charles R. Dougherty, Hill & Barlow, Boston, MA, Gerald A. Novack, Gail Kamnitz, Roberta H. Smith, Kirkpatrick & Lockhart LLP, New York City, of counsel), for Petitioner.

Daniel H. Kurtenbach, Federal Deposit Insurance Corporation, Washington, DC (Ann S. Duross, Assistant General Counsel, Richard J. Osterman, Jr., Senior Counsel, Feder-

al Deposit Insurance Corporation, Washington, DC, of counsel), for Respondent.

Before: MINER, JACOBS and CABRANES, Circuit Judges.

MINER, Circuit Judge:

Allan Hutensky petitions for review of a Decision and Order of the Federal Deposit Insurance Corporation ("FDIC") prohibiting him, pursuant to 12 U.S.C. § 1818(e), from further participation in the conduct of the affairs of any insured depository institution. The FDIC found that Hutensky violated Regulation O, 12 C.F.R. § 215, breached his fiduciary duties, and engaged in unsafe and unsound practices, as a result of his conduct in relation to three transactions: two bank loans in which the proceeds were transferred to his business interests and the modification of a line of credit for his business interest. For the reasons that follow, we grant the petition in part and remand to the FDIC for further proceedings consistent with this opinion.

## BACKGROUND

Hutensky is an attorney and businessman. He has participated in numerous partnerships and ventures in the State of Connecticut, and has been particularly active in the development of real estate. Hutensky claims that he "was involved in excess of a billion dollars worth of real estate and financial transactions" as of 1988. In order to finance these ventures, Hutensky had total borrowings of approximately two to three hundred million dollars.

Beginning in April of 1989, Hutensky served as a director of Cenvest, Inc. ("Cenvest"). Cenvest was the holding company for Central Bank ("Central") and First Central Bank ("First Central"). Cenvest, Central, and First Central all were located in Connecticut, and Central and First Central were insured State nonmember banks.[1] In April of 1989, Hutensky also became a director of First Central. In addition, Hutensky joined

the Joint Loan and Investment Committee of the Cenvest companies, and he became chairman of that committee in May of 1990. Although Hutensky never became a director of Central, he attended joint meetings of the boards of directors of Central and Cenvest.

### I. The Harding Loan

One of Hutensky's business projects was CityPlace Venture ("CityPlace"). Hutensky, along with Richard Bronson and Preston Harding, were partners in a limited partnership that held a 99% interest in CityPlace. Harding had been a business associate of Hutensky for many years.

In 1989, CityPlace began to incur monthly shortfalls, which were covered by another Hutensky entity, Bronson & Hutensky ("B & H"). By the summer of 1989, B & H had contributed approximately $600,000 to CityPlace to meet the operating expenses of CityPlace property in Hartford, Connecticut. Hutensky and his partners in CityPlace attempted to refinance the Hartford property with Suffield Bank, which held a mortgage on the property, but the bank refused their request. CityPlace apparently was unable to borrow money from other sources. Hutensky stated that "we didn't think that we had an ability to go out and raise that kind of money."

On August 21, 1989, First Central granted a loan to Harding in the amount of $1,050,000. On the same day, Harding made a loan to CityPlace in the same amount. CityPlace then wrote a check dated August 23, 1989 in the sum of $1,000,000 payable to B & H. Although Hutensky was a director of First Central, he did not notify the board of directors of First Central that the proceeds of the Harding loan would be transferred to CityPlace and B & H, and he did not seek prior approval for the loan.

The Harding loan has not been repaid. Hutensky and the FDIC stipulated that the Harding loan would result in a loss of

---

1. The term "State nonmember bank" refers to "any State bank which is not a member of the Federal Reserve System." 12 U.S.C. § 1813(e)(2). The term "insured bank" refers to

"any bank ... the deposits of which are insured in accordance with the provisions of this chapter." 12 U.S.C. § 1813(h).

$1,049,480.10 to the FDIC, as Receiver for Central.[2]

## II. The Reveruzzi Loan

In 1990, John Reveruzzi worked for B & H as an executive vice president. His duties primarily consisted of marketing and obtaining financing for B & H ventures. Reveruzzi also became a partner in several B & H projects.

In the summer of 1990, several B & H ventures, including ones in which Reveruzzi held an interest, were having cash flow problems. On July 30, 1990, Central granted a loan to Reveruzzi in the amount of $500,000. On the same day, Reveruzzi made a loan to B & H in the same amount. Hutensky did not notify the board of directors of Central that the proceeds of the Reveruzzi loan would be transferred to B & H, and he did not seek prior approval for the loan.

The Reveruzzi loan has not been repaid. Hutensky and the FDIC stipulated that the Reveruzzi loan would result in a loss of approximately $439,469.48 to the FDIC, as Receiver for Central.

## III. Modification of the B & H Line of Credit

Prior to April of 1990, Hutensky and Bronson each had $2.5 million of outstanding personal unsecured credit from Central. On April 23, 1990, the board of directors of Central approved a $9.5 million line of credit for B & H. The line of credit was secured by B & H's 12.5% ownership interest in a shopping mall known as the Pavilions at Buckland Hills in Manchester, Connecticut (the "Mall").[3] The purpose of the line of credit was to secure $3.5 million of the existing $5 million unsecured debt and to provide $6 million as working capital for B & H projects.

In May of 1990, Connecticut State banking authorities began an investigation into whether the line of credit to B & H violated state lending limits. The banking authorities later notified Central of three "apparent violations" of federal and state banking laws and regulations.

By August of 1990, $5.7 million of the $9.5 million line of credit had been advanced by Central and was outstanding. On August 27, 1990, at a joint board meeting of Central and Cenvest, Hutensky presented a proposal to restructure the debt obligations of B & H to Central. According to Hutensky's proposal, Central would release its security interest in the Mall, and B & H would sell this interest. B & H then would pay Central $2.2 million of the sale proceeds to reduce the outstanding debt to $3.5 million.

Hutensky acknowledges that he participated in a discussion with the Central board concerning the proposed modification of the line of credit. He stated:

> There was a lengthy discussion of what it was we were trying to do, and I, no question, participated in that discussion and explained it, because most of the people on the board really didn't have a clear understanding as to what they did in April and what the obligations of the bank were and what the proposal was.

Following this discussion, Hutensky was asked to leave the room.

After the board engaged in further discussion, it requested that Hutensky prepare a written summary of his proposal. In the written summary, Hutensky stated that B & H is "in the process of selling [its] interest in the partnership presently held as collateral. The sale will take place in the latter part of 1990 or early 1991." After reviewing the written summary and engaging in additional discussion, the board voted to accept Hutensky's proposal. Hutensky did not participate in the vote.

On October 3, 1990, B & H and Melvin Simon & Associates, Inc. ("Simon") signed a purchase and sale agreement, in which Simon

---

2. On December 31, 1990, First Central was merged into Central. On October 18, 1991, Central was declared insolvent by the State of Connecticut, and the FDIC was appointed Receiver for Central.

3. B & H held a 25% interest in the Manchester Simon Developers Limited Partnership (the "Manchester Partnership"), which was controlled by Melvin Simon & Associates, Inc. The Manchester Partnership and Homart Manchester Investment Co. ("Homart") each held a 50% interest in the Mall.

agreed to buy B & H's Mall interest and another property interest for $5.8 million. On October 6, 1990, Central entered into a $3 million participation agreement with Mechanics Savings Bank ("Mechanics"), in which Mechanics took a participation interest in the B & H line of credit, with a priority position.

However, B & H's sale of its Mall interest to Simon did not close. Instead, Simon entered into an agreement with Homart, in which Homart agreed to buy out the Manchester Partnership's interest in the Mall. As a result of this agreement, the October 3rd purchase and sale agreement between Simon and B & H was nullified. Under the terms of Homart's buy-out agreement, B & H received only about $4.6 million for its interest in the Mall. Mechanics was wired approximately $3 million of this sum to pay off its participation interest, and Central received the balance of about $1.6 million. As a result, Central received approximately $600,000 less in proceeds from the sale of B & H's Mall interest than had been anticipated at the time of the August 27, 1990 modification.

On December 31, 1990, Hutensky resigned from his positions at Cenvest and First Central, after new management assumed control of the companies.

### IV. The FDIC's Administrative Action

On December 22, 1992, the FDIC issued a Notice of Intention to Prohibit from Further Participation ("Notice"), pursuant to 12 U.S.C. § 1818(e)(1).[4] The Notice named as respondents Hutensky and four other former officers and directors of First Central and Central. The Notice contained one charge against Hutensky, based on his conduct in connection with the modification of the B & H line of credit at the August 27, 1990 meeting of Central's board. On May 17, 1993, the Notice was amended to include a charge against Hutensky based on his involvement with the Harding loan. On November 24, 1993, the Notice again was amended to include a charge against Hutensky based on his involvement with the Reveruzzi loan.

All the respondents named in the Notice except for Hutensky consented to the entry of prohibition orders. Thereafter, a hearing was held before an administrative law judge ("ALJ") on the charges against Hutensky. The hearing was conducted over a period of eight days in January and February of 1994. On November 28, 1994, the ALJ issued his Recommended Decision, finding that Hutensky violated Regulation O,[5] breached his fi-

---

4. Section 1818(e)(1) provides, in relevant part:

> Whenever the appropriate Federal banking agency determines that—
> (A) any institution-affiliated party has, directly or indirectly—
>     (i) violated—
>         (I) any law or regulation;
>     . . . .
>     (ii) engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or
>     (iii) committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;
> (B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)—
>     (i) such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage; [and]
>     . . . .
> (C) such violation, practice, or breach—
>     (i) involves personal dishonesty on the part of such party; or
>     (ii) demonstrates willful or continuing disregard by such party for the safety or sound-

ness of such insured depository institution or business institution,

> the agency may serve upon such party a written notice of the agency's intention to ... prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

5. All references to Regulation O in this opinion are to the version in effect in 1989 and 1990 at the time of the events at issue in this case. Section 215.4(b) of Regulation O provides, in pertinent part:

> *Prior approval.* (1) No member bank may extend credit (which term includes granting a line of credit) to any of its executive officers, directors, or principal shareholders or to any related interest of that person ... unless:
>     (i) The extension of credit has been approved in advance by a majority of the entire board of directors of that bank, and (ii) the interested party has abstained from participating directly or indirectly in the voting. In no event may a member bank extend credit to any one of its executive officers, directors, or principal shareholders, or to any related interest of that person, in an amount that, when aggregated with all other extensions of

duciary duties, and engaged in unsafe and unsound banking practices, and recommending that a prohibition order be issued against Hutensky. The FDIC's Enforcement Counsel and Hutensky filed exceptions to the ALJ's Recommended Decision.

On May 3, 1995, the FDIC issued a Decision and Order, adopting and incorporating the ALJ's Recommended Decision and the exceptions of the FDIC's Enforcement Counsel, and rejecting the exceptions of Hutensky. The FDIC found that there was substantial evidence to support the issuance of a prohibition order against Hutensky. The FDIC determined that Hutensky's conduct in connection with the Harding and Reveruzzi loans and the modification of the B & H line of credit violated Regulation O. Hutensky's actions also were found to have constituted breaches of his fiduciary duties and unsafe and unsound banking practices. The FDIC further determined that, as a result of Hutensky's actions, losses were sustained by the FDIC, as Receiver for Central. Finally, the FDIC found that Hutensky's actions manifested willful disregard for the safety and soundness of the banks as well as personal dishonesty. Accordingly, the FDIC ordered, *inter alia*, that "Hutensky shall not participate in any manner in the conduct of the affairs of any insured depository institution" without the prior written consent of the appropriate federal agencies. Hutensky filed a Petition for Review of the FDIC's Decision and Order.

## DISCUSSION

### I. Standard of Review

■ Pursuant to 12 U.S.C. § 1818(h)(2), our review of the FDIC's Decision and Order is governed by 5 U.S.C. § 706. Under this standard, the FDIC's "legal conclusions must be affirmed unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' and [its] findings of fact must be sustained unless they are 'un-

supported by substantial evidence' in the record considered as a whole." *Yellow Freight Sys., Inc. v. Reich,* 38 F.3d 76, 80–81 (2d Cir.1994) (quoting 5 U.S.C. § 706(2)). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 81 (quotation omitted). In reviewing the FDIC's Decision and Order, we must accord deference to the FDIC's reasonable construction of the statutes that it administers. *Id.*

### II. The Harding and Reveruzzi Loans

Hutensky contends that the FDIC erred in finding that a prohibition order was warranted as a result of his involvement with the Harding and Reveruzzi loans. First, he argues that the FDIC erred in determining that he engaged in prohibited conduct within the meaning of § 1818(e)(1)(A). In addition, Hutensky claims that the FDIC's findings that he acted with willful disregard and personal dishonesty with respect to the two loans are unsupported by the evidence. We reject both of these contentions.

#### A. Prohibited Conduct

Under § 1818(e), in order for a prohibition order to be issued, there must be evidence that a party has engaged in prohibited conduct. One type of misconduct is where an "institution-affiliated party has, directly or indirectly ... violated ... any law or regulation." § 1818(e)(1)(A). The term "institution-affiliated party" includes "any director, officer, [or] employee ... of ... an insured depository institution" and "any other person as determined by the appropriate Federal banking agency (by regulation or case-by-case) who participates in the conduct of the affairs of an insured depository institution." 12 U.S.C. § 1813(u).

Section 215.4(b)(1) of Regulation O provides that "[n]o member bank may extend credit ... to any of its ... directors ... or to any related interest of that person" unless "[t]he extension of credit has been approved

credit to that person, and all related interests of that person, exceeds $500,000, except by complying with the requirements of this paragraph.

. . . .

(3) Participation in the discussion, or any attempt to influence the voting, by the board of directors regarding an extension of credit constitutes indirect participation in the voting by the board of directors on an extension of credit.

in advance by a majority of the entire board of directors of that bank." Section 215.2(k) defines a "[r]elated interest" as "a company that is controlled by a person."[6] Under § 215.3(f), "[a]n extension of credit is considered made to a person covered by this part to the extent that the proceeds of the extension of credit are used for the tangible economic benefit of, or are transferred to, such a person."

■ In the present case, while Hutensky was a director of First Central, the bank made a $1,050,000 loan to Harding, who then transferred the proceeds to CityPlace, without the prior approval of First Central's board of directors. In addition, at the time that Hutensky was, for the purposes of Regulation O, a director of Central,[7] the bank granted a $500,000 loan to Reveruzzi, who then transferred the proceeds to B & H, without the prior approval of Central's board of directors. Accordingly, in both of these transactions, the banks extended credit, within the meaning of § 215.3(f), to entities that were related interests of Hutensky. Hutensky's failure to obtain prior board approval of these loans violated Regulation O.

Hutensky, nonetheless, argues that the FDIC misapplied the law of this Circuit in determining that the Harding and Reveruzzi loans violated Regulation O. He refers to our decision in *United States v. Docherty*, 468 F.2d 989 (2d Cir.1972), in which we held that, in the context of a criminal prosecution for willful misapplication of bank funds under 18 U.S.C. § 656, a transaction does not constitute an improper loan where the named borrower "knew he was putting his own credit on the line, and it is not suggested that he lacked the means to repay." *Id.* at 995.

Hutensky contends that we reaffirmed this holding in *United States v. Castiglia*, 894 F.2d 533 (2d Cir.), *cert. denied*, 498 U.S. 821, 111 S.Ct. 68, 112 L.Ed.2d 42 (1990), where we stated that "[t]he key issue is whether the named borrowers fully understood and recognized their obligations to repay." *Id.* at 536. In *Castiglia*, we affirmed the conviction of a bank officer and other defendants under § 656 because the evidence demonstrated that the nominal debtors had been assured that the bank officer was responsible for repaying the loans. *Id.* at 537.[8]

Hutensky argues that the named borrowers, Harding and Reveruzzi, recognized their obligations to repay the loans. Accordingly, Hutensky claims that each transaction should be viewed as two separate loans—one loan from the bank to a named borrower, and a second loan from the named borrower to a partnership involving Hutensky. As a result, he argues, there was no obligation to obtain the boards' prior approval of the transactions, and Regulation O was not violated. We disagree. Regulation O provides that "[a]n extension of credit is considered made to a person ... to the extent that the proceeds ... are used for the tangible economic benefit of, *or are transferred to*, such a person." § 215.3(f) (emphasis added). This language does not tie a finding of an "extension of credit" to the nominal debtor's understanding of his repayment obligation or his ability to meet that obligation. Rather, it makes clear that an "extension of credit" includes a transfer of proceeds; there is no dispute that the proceeds of the Harding and Reveruzzi loans were transferred to related interests of Hutensky. Accordingly, we do not see any reason to apply caselaw construing § 656, a statute providing criminal penal-

6. Section 215.2(b)(1) defines "[c]ontrol of a company or bank" to mean "that a person directly or indirectly, or acting through or in concert with one or more persons[,] ... [h]as the power to exercise a controlling influence over the management or policies of the company or bank."

7. Although Hutensky was not appointed to Central's board of directors, § 215.2(c) of Regulation O provides that a " '[d]irector of a member bank' includes ... any director of a bank holding company ... of which the member bank is a subsidiary." According to 12 U.S.C. § 1828(j)(2), this definition of a director applies to nonmember

insured banks in the same manner as if they were member banks. Hutensky was a director of Cenvest, a bank holding company, of which Central was a nonmember insured subsidiary. Accordingly, for purposes of Regulation O, Hutensky also was a director of Central.

8. In *Castiglia*, we also noted that "[c]ongressional action to restrict the circumstances under which a bank may make loans to its officers has cast substantial doubt on whether [*Docherty*] would be decided the same way today." *Id.* at 540 (citation omitted).

ties for misapplication of bank funds. Therefore, the FDIC properly determined that Hutensky violated Regulation O when he failed to obtain prior approval of the Harding and Reveruzzi loans.[9]

### B. Culpability

█ In order for the FDIC to issue a prohibition order against a party, the party's "violation, practice, or breach" must "involve[ ] personal dishonesty on the part of such party; or ... demonstrate[ ] willful or continuing disregard by such party for the safety or soundness of such insured depository institution." § 1818(e)(1)(C). We think that there is substantial evidence that Hutensky's conduct in relation to the Harding and Reveruzzi loans involved personal dishonesty.

The record shows that Hutensky was an attorney and a sophisticated businessman, and that he had been involved in numerous business projects. At the time of the Harding loan, Hutensky's venture, CityPlace, needed funds. In addition, at the time of the Reveruzzi loan, B & H was having cash flow problems.[10] As a result of the two loans, Hutensky's entities were able to obtain needed funds, without having to follow the formal approval process mandated by Regulation O. In *Greenberg v. Board of Governors*, 968 F.2d 164 (2d Cir.1992), we held that the record supported a determination of personal dishonesty, where two bank directors did not disclose to the bank's board of directors that they had a controlling interest in partnerships that received loans from the bank. *Id.* at 171. Similarly, the record here supports a finding of personal dishonesty. Hutensky failed to inform the First Central and Central boards of directors of his business relationship with the parties obtaining the loans, or that the proceeds of the loans would pass to entities he controlled. Even though in the present case, the proceeds were not directly lent to Hutensky's interests as in *Greenberg*, but instead first passed through Harding

and Reveruzzi, Hutensky still was required under Regulation O to obtain prior approval of the loans. Hutensky bypassed the required procedures and received the benefit of the proceeds as a result of his actions, and, therefore, his conduct demonstrated personal dishonesty.

Hutensky, however, contends that he did not know that he was required under Regulation O to obtain prior approval of the loans. In respect to the Harding loan, Hutensky testified, "I did not give a lot of thought, this wasn't pressed in my mind should I tell the board, not tell the board, what should I do." As to the Reveruzzi loan, Hutensky testified, "Did I feel that I had an obligation? Again, I don't think I sat down and said, okay, Mr. Reveruzzi's borrowing money from Central Bank, I'm on the board at Cenvest, what are my obligations with regard to that." In *Cavallari v. Office of the Comptroller of the Currency*, 57 F.3d 137 (2d Cir.1995), we found that substantial evidence supported the finding that an attorney was culpable for disregarding a cease and desist order issued against a bank, even though the attorney claimed: "I knew there was [sic] cease and desist orders, I didn't know what the contents were. I didn't think about it, to tell you the truth." *Id.* at 140 (alteration in original); *cf. Greenberg*, 968 F.2d at 171 (stating that the "Board and the ALJ were well within their discretion in rejecting the [bank directors'] self-serving testimony" that they had revealed their insider transactions to the bank's board of directors). In view of the evidence of Hutensky's extensive experience in law and business, the fact that his business interests received needed funds from the banks, and his willingness to forgo any consideration of whether these personally advantageous deals were consistent with his legal and fiduciary obligations, we agree with the FDIC that Hutensky's actions mani-

---

9. Because Hutensky's conduct in connection with the two loans violated Regulation O, we do not address whether his actions also were breaches of his fiduciary duties or unsafe or unsound banking practices under § 1818(e)(1)(A).

10. The record also indicates that, at the time of the Reveruzzi loan, it may have been difficult for B & H to obtain additional funds from Central due to the apparent violations of state and federal lending limitations. However, there is no evidence that there were any problems in respect to lending limitations at the time of the Harding loan.

fested personal dishonesty, despite his claims that he acted without culpability.

### III. *The Modification of the B & H Line of Credit*

■ The FDIC also based its prohibition order on Hutensky's conduct in connection with the modification of the B & H line of credit by Central's board of directors on August 27, 1990. Hutensky contends that there was insufficient evidence to show that he acted with culpability at the August 27th meeting. We agree that the record does not support a determination of culpability as required under § 1818(e)(1)(C).

In its Decision and Order, the FDIC made the following findings:

9. On August 27, 1990, Hutensky had no contract for the sale of the Mall Partnership. At that time he could not have known whether a sale would take place or the amount of proceeds to be derived from such a sale in the event it did occur.

10. On August 27, 1990, when he represented to Central that it would receive $2.2 million from the proceeds of the sale of the Mall Partnership, Hutensky intentionally misled the Bank for the purpose of inducing it to release its security interest in the Mall Partnership.

11. Hutensky's intentional misrepresentation that Central would receive $2.2 million from the proceeds of sale of the Mall Partnership was a breach of his fiduciary duty of loyalty to Central and an act of personal dishonesty.

We do not think, however, that Hutensky's statements to the Board on August 27, 1990 constituted intentional misrepresentations to Central's board of directors. In his written summary of the modification proposal, Hutensky stated that B & H is "in the process of selling [its] interest in the partnership

presently held as collateral. The sale will take place in the latter part of 1990 or early 1991." At the time of the August 27th meeting, Hutensky had a draft of a purchase and sale agreement for B & H's interest in the Mall. Thus, B & H was in the process of selling its Mall interest, and Hutensky intended for the sale to take place. The fact that the sale later fell through does not mean that Hutensky's statements on August 27th were misrepresentations.[11] Accordingly, there is insufficient evidence that Hutensky acted with culpability in respect to the August 27, 1990 modification of the B & H line of credit by Central's board.[12]

### IV. *Uncharged Factual Circumstances and Violations*

Hutensky also asserts that the prohibition order was based on uncharged factual circumstances and uncharged legal violations. He contends that, as a result, he was deprived of his due process right to notice and a full and fair opportunity to defend himself. We reject this contention.

■ Hutensky argues that "the FDIC has sanctioned [him] based on a whole constellation of uncharged factual circumstances." For instance, he contends that the FDIC improperly relied on evidence pertaining to "poor underwriting, sloppy credit analyses, false statements in credit memos, and other misconduct by persons other than Hutensky." However, this evidence merely described the background of the transactions involving Hutensky, and was not used to assert separate allegations against him. In addition, Hutensky claims that the FDIC improperly referred to evidence of the alleged lending limit violations, but this evidence also was used by the FDIC only as background information.

■ Hutensky further argues that he was sanctioned for alleged legal violations that

---

**11.** In its Decision and Order, the FDIC also alludes to alleged misrepresentations by Hutensky in April of 1990 as to the value of B & H's interest in the Mall and in October of 1990 as to the amount of proceeds expected from the sale of the Mall interest. However, the FDIC does not show how these alleged misrepresentations affected the decision of Central's Board on August 27, 1990 to approve the modification of the B &

H line of credit, and therefore they are not evidence of culpability on the part of Hutensky.

**12.** Because there is insufficient evidence of culpability, we do not address whether Hutensky's actions at the August 27, 1990 board meeting constituted prohibited conduct within the meaning of § 1818(e)(1)(A).

were not charged against him in the Notice. For instance, he asserts that the FDIC found that he had violated Regulation O in connection with the Harding and Reveruzzi loans, but that these charges were not set forth in the Notice. While the charges against Hutensky pertaining to the two loans did not specifically mention Regulation O, they did describe the elements of a Regulation O violation, including the fact that Hutensky failed to notify the banks' boards of the loans even though he would benefit from them.[13] Accordingly, Hutensky was provided with adequate notice that he would have to defend against these charges, even though the charges were not specifically styled as the elements of a Regulation O violation. *See Garber v. Civil Aeronautics Bd.*, 276 F.2d 321, 323 (2d Cir.1960) (holding that complaint "clearly apprised the petitioner of the facts contended to constitute a violation and the legal consequences claimed to ensue" and thus "was not required to refer to the particular section claimed to have been violated, at least when [the] failure to do so was in no way misleading"); *see also Pergament United Sales, Inc. v. NLRB*, 920 F.2d 130, 135 (2d Cir.1990) (in the context of the National Labor Relations Act, a respondent has sufficient notice if he is informed of "the acts forming the basis of the complaint").

## CONCLUSION

In view of the foregoing, we grant Hutensky's petition for review of that part of the FDIC's Decision and Order sanctioning him for his conduct in connection with Central's August 27, 1990 modification of the B & H line of credit. We remand to the FDIC with instructions that it determine the appropriate sanctions, if any, for Hutensky on the basis

of his involvement in the Harding and Reveruzzi loans only.

---

13. The Notice, as amended, included the following charges:

Unsafe or unsound banking practices committed by Hutensky with regard to [the Harding loan], include, but are not limited to, the following: ... Hutensky failed to make full disclosure to the Board of First Central that he and/or an affiliated company or entity would receive a direct or indirect benefit from this credit.

. . . .

Unsafe and unsound banking practices and/or breaches of fiduciary duty committed by Hutensky with regard to [the Reveruzzi loan] include, but are not limited to, the following: ... Hutensky, as Chairman of Central's Loan and Investment Committee failed to protect the interests of Central by not notifying Central's Board that he and/or an affiliated partnership would receive a tangible economic benefit from this loan.