**UNITED STATES of America,**
**Appellee,**

v.

**Robert H. DOCHERTY, Appellant.**

**No. 61, Docket 72–1299.**

United States Court of Appeals, Second Circuit.

Argued Sept. 13, 1972.

Decided Oct. 31, 1972.

H. Kenneth Schroeder, Jr., Sp. Asst. U. S. Atty. (John T. Elfvin, U. S. Atty., Buffalo, N. Y., of counsel), for appellee.

Charles J. McDonough, Buffalo, N. Y., for appellant.

Before FRIENDLY, Chief Judge, and LUMBARD and FEINBERG, Circuit Judges.

FRIENDLY, Chief Judge:

In this prosecution of a 35-year old lawyer, the Government has sought to press to the verge the section of the federal criminal code, 18 U.S.C. § 656, prohibiting the theft, embezzlement or misapplication of bank funds by a bank officer or employee. Admittedly, the defendant, a borrower from a Buffalo, N. Y. bank, neither obtained nor sought any personal gain. Moreover, so far as concerns the transactions in which he participated, or of which he knew, he is bound and, so far as the record shows, is able, to make the bank whole. Our problem is whether the Government has gone only to the verge or beyond it.

There is no real dispute over the facts: The defendant, Robert Docherty, met Edward Evans in 1956 while both were students at the University of Buffalo. They became, and remained, close personal friends. After graduation, Evans went into the service of Manufacturers & Traders Trust Company of Buffalo (M & T), where, by 1968, he

had risen to the post of assistant vice president in charge of the personal loan section of the bank's Installment Loan Department. Docherty entered and completed law school, and was admitted to practice. In 1962 Docherty had begun borrowing from M & T for tuition and other purposes. The loans, concededly legitimate, were arranged through Evans. Later Docherty and his law partner secured a joint loan of $7,000 from M & T. Each of these loans was repaid prior to Docherty's indictment. The procedure, followed also with respect to the loans that formed the subject of the indictment, was for him to sign an application and a note, with the amount of the latter and the summary sheet [1] temporarily left blank pending the bank's computation of prepaid interest and other charges. Evans would write "See Ed Evans" or its equivalent on the summary sheet, which was an indication to the collection department that Evans should be notified if any default occurred. All this was standard procedure.

Docherty's troubles began with a luncheon discussion in October 1965, when Evans told Docherty that he needed money to buy some stock and requested that Docherty borrow $2,000 and reloan it to him. When Docherty asked why Evans didn't borrow the money himself, Evans answered that bank policy prohibited his borrowing from his own bank. Docherty countered with a query why Evans didn't borrow from another bank; Evans replied that the bank frowned upon this also. Docherty filled out the note and application. He did not fill out the blank in the application with respect to the purpose of the loan, a course that was not uncommon. Evans told him there was no need to complete the credit statement or furnish other information since M & T had Docherty's financial statements in connection with his personal loans. The bank made the loan; Docherty picked up the $2,000

check, cashed it, and gave Evans the proceeds. He also turned over to Evans the "coupon book" which reminded the borrower of the dates and amounts of installment loan payments.

The process was repeated in February 1966. When Docherty asked what had happened about the first loan, Evans said it had been paid. Except for some increases in amount, substantially the same facts recurred in June 1966, in May, August and September 1967, and in February and April 1968. Evans' stories to Docherty were that he wanted to buy stock, to pay off earlier loans or, on one occasion, to invest in a gas station. With respect to the substantive counts based on these transactions, the jury either acquitted (as to the 1965 and 1966 loans) or disagreed.

In July 1968 Evans asked Docherty to take out a loan of $4800. When Docherty protested that the amount was too high, Evans answered that he had decided not to buy stock but would instead use the proceeds to repay a prior loan. Docherty deposited the bank's $4800 check in his own account, drew a check in the same amount to M & T, and gave it to Evans. Evans turned it over to M & T in payment of the earlier loan, and Ourser, a vice president of the bank, advised Docherty that the loan had been repaid. On September 4, 1968, Docherty made another $3,000 loan; the proceeds went to Evans. On October 29 he signed a blank note at Evans' request; Evans filled it in for $6,292.44. Of the $5,000 in net proceeds, $2,000 were used to pay off the September loan, and a $3,000 bank check was deposited by Evans, without Docherty's endorsement, to the account of Larry's Petro Service, which he was also manipulating, without Docherty's knowledge. The final transaction occurred late in 1968 or early in 1969, when Docherty, assuming that all earlier loans had been paid by Evans, signed another blank application and note. The bank issued a check for $4800

---

1. This shows the gross amount of the loan, the deductions for prepaid interest, life insurance, etc., and the net amount of the loan. It also gives payment information, *i. e.*, the number and amount of installment payments.

payable to "R. Docherty." Evans forged Docherty's endorsement and cashed the check at a Las Vegas hotel. When signing this last note, Docherty had demanded that Evans render an accounting before he would endorse any more checks; doubtless this led to the forgery. The jury convicted on the four substantive counts relating to these notes.

Late in 1968 Docherty had received his first "late payment" notice from the bank. Thinking this related to one of the loans he had made for his own account, he instructed his secretary to make the payment. When she informed him that the notice did not relate to any of his personal loans, he telephoned Evans, who said that the bank had made an error and instructed that the notice should be sent on to him. Ultimately, it was discovered that Evans had been manipulating the accounts of six or seven other friends and making payment of the old loans with the proceeds of new ones; his total embezzlements were in the neighborhood of $300,000.

■ It will be convenient to deal first with the conspiracy count, on which the jury also convicted. This charged a conspiracy to violate not only 18 U.S.C. § 656 but also § 1005. The relevant provision of § 1005 condemns:

> Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank . . . or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System . . . .

We fail to see what "false entry" Docherty participated in making. The loans were recorded as his liabilities, and they are. Contrast Hargreaves v. United States, 75 F.2d 68, 72 (9 Cir. 1935), where a bank officer had caused sham notes to be recorded. Neither was there sufficient evidence that Docherty made any false statements of his purpose for the loans. In only one instance did he make any statement of purpose. This was with regard to the June 1966 loan, where he filled in the word "personal" in the space on the loan application appearing after the phrase "Proceeds of Loan to be used for." In light of the principles applicable in the construction of criminal statutes, see Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L. Ed. 905 (1955), we would not consider this description of a loan made as an accommodation to a friend to be a "false entry"; a statement that he intended to use the loan to buy a car or for office expenses would stand quite differently. The conviction on the conspiracy count thus cannot survive unless there was sufficient evidence to show the violation of § 656 charged in it and in the four substantive counts on which Docherty was convicted as an aider and abettor.[2]

■ A violation of 18 U.S.C. § 656 requires, so far as here relevant, a situation where a bank officer, director, agent or employee "embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank . . . ." When a defendant is charged simply as an aider or abettor, submission to the jury is warranted only if there is enough evidence to show that he knew of such activity of the principal and desired to forward it. 18 U.S.C. § 2; United States v. Peoni, 100 F.2d 401, 402 (2 Cir. 1938); United States v. Turnipseed, 272 F.2d 106, 107 (7 Cir. 1959). Our summary alone demonstrates the insufficiency of the evidence under our recent decision in United States v. Taylor, 464 F.2d 240 (2 Cir. 1972) or, for that matter under the previous rule in this circuit, to show knowledge on Docherty's part that

---

2. Perhaps it could not survive in any event because of the possibility that the jury could have convicted on the basis of a conspiracy to violate § 1005 alone, although this is minimized by the convictions on the four substantive counts under § 656. In view of our conclusion with respect to § 656, it is unnecessary to consider this.

Evans intended to embezzle, abstract or purloin moneys, funds or credits of M & T. The validity of his conviction must therefore rest on holding that his admitted knowledge that the proceeds of the loans were going into Evans' hands in violation of the bank's internal rules [3] constituted guilty knowledge of wilful misapplication.

The words "willfully misapply" first appeared in the Act of June 3, 1864, ch. 106, § 55, 13 Stat. 116, which, in addition, required proof of intent "to injure or defraud the [banking] association or any other company or body politic or corporate, or any individual person, or to deceive any [bank] officer . . ., or any agent appointed to examine the affairs of [the bank] . . . ." The Act of April 6, 1869, ch. 11, 16 Stat. 7, added an aiding or abetting offense.

The phrase "willfully misapply" has proved troublesome from the outset. In United States v. Britton, 107 U.S. 655, 669, 2 S.Ct. 512, 524, 27 L.Ed. 520 (1883), the Supreme Court, answering certified questions with respect to a multi-count indictment under the statute, noted that:

> The words "willfully misapplied" are, so far as we know, new in statutes creating offenses, and they are not used in describing any offense at common law. They have no settled meaning like the word "embezzle," as used in the statutes, or the words, "steal, take and carry away," as used at common law.

Particularly relevant is the Court's discussion of a count charging the bank president with having used funds of the bank to purchase its own stock, which he held in trust for the bank's use.

Conceding that such a purchase by the bank itself, except to secure a debt, would be forbidden by law, the Court held that this count did not set forth an offense, stating, 107 U.S. at 666–667, 2 S.Ct. at 522 (emphasis added):

> We think the willful misapplication made an offense by this statute means a misapplication for the use, benefit or gain of the party charged, or of some company or person other than the [banking] association. Therefore, to constitute the offense of wilful misapplication, there must be a *conversion* to his own use or the use of some one else of the moneys and funds of the association by the party charged.

See, to the same effect, United States v. Northway, 120 U.S. 327, 332, 7 S.Ct. 580, 30 L.Ed. 664 (1887). It would follow that, to support a conviction for aiding and abetting in a "wilful misapplication," the alleged aider or abettor must have knowledge that the officer intended to effect a conversion. The Court also stated in *Britton,* 107 U.S. at 667, 2 S.Ct. at 522, that the counts relating to the stock purchase "[charged] maladministration of the affairs of the bank, rather than criminal misapplication of its funds" and that, if the counts were held to be good, "every official act of an officer, clerk or agent of a banking association, by which its funds are applied in a way not authorized by law, would be punishable . . . ." It would seem to follow *a fortiori* that mere knowledge that the transactions here at issue violated a bank rule would not suffice to support a conviction for aiding and abetting.

There are two other early Supreme Court cases, which, on different facts, upheld indictments for wilful misappli-

---

3. On brief in this court, although apparently not at the trial, the Government also relies on N.Y. Banking Law § 103, subd. 8, which prohibits any bank or trust company from lending money to any executive officer or director unless the making of the loan was approved in writing, not more than three months earlier, by a majority of the board of directors (excluding any director receiving the loan) or was within a general resolution of similar tenor, subject to various exceptions, one being loans not exceeding at any one time $5,000 or 1% of the bank's net worth, whichever is less. Apart from other considerations, there was not sufficient evidence of Docherty's knowledge that the loans to Evans exceeded the permitted figure.

cation. Evans v. United States, 153 U.S. 584, 591–593, 14 S.Ct. 934, 38 L.Ed. 830 (1894), sustained an indictment which charged a bank director with aiding and abetting wilful misapplication by causing the cashier to discount an unsecured note. Conceding that discount of such a note was not in itself a misapplication, the Court concluded that the indictment was saved since it could be read as charging that, to the knowledge of the director and cashier, the maker of the note had no intention to pay. Coffin v. United States, 156 U.S. 432, 449–451, 15 S.Ct. 394, 39 L.Ed. 481 (1895), similarly held there was a wilful misapplication when a bank officer had discounted an unsecured note of a maker he knew to be insolvent.

The cases where courts of appeals have upheld convictions for wilful misapplication have involved a considerably greater degree of iniquity or of foreseeable loss than anything of which Docherty knew. Wilful misapplication has been found, for example, when a bank employee knowingly engaged in a check "kiting" scheme for the benefit of depositors, United States v. Mullins, 355 F.2d 883 (7 Cir.), cert. denied, 384 U.S. 942, 86 S.Ct. 1465, 16 L.Ed.2d 540 (1966); when a bank employee paid money out to a customer on a check he knew was backed by insufficient funds and then concealed the overdraft, Logsdon v. United States, 253 F.2d 12 (6 Cir. 1958); when a bank officer loaned money without security knowing that the borrower could not repay, Robinson v. United States, 30 F.2d 25 (6 Cir. 1929); when a depositor repeatedly overdrew his account, knowing that the branch manager was consistently ignoring this, Benchwick v. United States, 297 F.2d 330 (9 Cir. 1961); when a bank officer caused his bank to borrow from another and pocketed the proceeds, leaving his own bank only with a personal note of an employee of the lending bank which he had no reason to think would be paid, Hargreaves v. United States, 75 F.2d 68 (9 Cir.), cert. denied, 295 U.S. 759, 55 S.Ct. 920, 79 L.Ed. 1701 (1935); and, as we have recently held, when a bank officer pocketed the proceeds of loans knowingly issued on the strength of fraudulent loan applications, United States v. Fortunato, 402 F.2d 79 (2 Cir. 1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). On the other hand, Johnson v. United States, 95 F.2d 813 (4 Cir. 1938) (Soper, J.), held that no crime was charged when the indictment alleged only that a bank president, whose conduct was characterized with a copious array of pejorative adverbs, had discounted a note payable to himself and applied the proceeds to his own account, in order to meet an overdraft. The court found the indictment flawed since there was no allegation that the maker was known to be insolvent or to have an intention not to pay.

In applying the provision of 18 U.S.C. § 656 relating to "wilful misapplication," courts must be mindful of its history and avoid undue extension as a result of the ill-conceived work of the 1948 reviser. Until that time the statute, as previously noted, after defining the prohibited acts, had included a requirement of intent "to injure or defraud" the bank or "to deceive" a bank officer or agent appointed to examine the affairs of the bank. See 12 U.S.C. §§ 592, 597 (1945). When these sections were repealed and 18 U.S.C. § 656 was substituted, by the Act of June 25, 1948, ch. 645, § 656, 62 Stat. 729, the Reviser represented that: "The revised section without changing in any way the meaning or substance of existing law, clarifies, condenses, and combines related provisions largely rewritten in matters of style." Some courts, referring to the Reviser's Note, have properly held that intent to injure or defraud remains an element of the offense. E. g., Seals v. United States, 221 F.2d 243 (8 Cir. 1955); Logsdon v. United States, 253 F.2d 12 (6 Cir. 1958), aff'g 132 F.Supp. 3 (W.D.Ky.1955); Ramirez v. United States, 318 F.2d 155 (9 Cir. 1963). Others, including our own, while not discussing the omission of the intent

language from § 656, have continued to treat intent to injure or defraud as an essential element of the crime. *E. g.*, United States v. Mullins, *supra*, 355 F. 2d 883; United States v. Fortunato, *supra*, 402 F.2d 79. By the same token an intent to deceive remains an alternative mental element. See 18 U.S.C. § 1005.

Here there was clearly no sufficient evidence of intent to "injure" the bank. Docherty knew he was putting his own credit on the line, and it is not suggested that he lacked the means to repay. *Cf.* United States v. Matot, 146 F.2d 197 (2 Cir. 1944). As to defrauding, even if we assume *arguendo* that failure to disclose the true recipient of the proceeds was a misrepresentation, the case lacks the element of foreseeability of damages essential even for a civil suit. Prosser, Torts § 110, at 732 (1971). *Cf.* United States v. Harper, 33 F. 471, 481–482 (S.D.Ohio 1887); Seals v. United States, *supra*, 221 F.2d at 249. Indeed, there will be no damages at all from the transactions in which Docherty took part, if, so far as the record shows, the notes are collectible. Beyond this we are by no means convinced that, when Congress speaks of intent to defraud in a criminal statute, it means merely the attitude of mind that would support a civil action. Compare the discussion of the meaning of "wilful" in United States v. Murdock, 290 U.S. 389, 394–395, 54 S.Ct. 223, 78 L.Ed. 381 (1933); Spies v. United States, 317 U.S. 492, 497–498, 63 S.Ct. 364, 87 L.Ed. 418 (1943); and Screws v. United States, 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Finally, there was no intent to deceive a bank officer or examiner. Docherty's failure to disclose the true recipient of the proceeds of the loan cannot be considered a deceit when, as we have held, he made no false statement of his purpose for the loan.

We thus should have had little doubt that Docherty's conviction must be reversed for insufficiency of evidence were it not for the portion of this court's recent decision in United States v. Iannelli, 461 F.2d 483 (2 Cir. 1972), petition for cert. filed, 41 U.S.L.W. 3137 (U.S. Sept. 19, 1972), relating to the defendant Squires. If the statement in that opinion, *id.* at 486, that "[i]t was sufficient to show only that Squires knew that Michael's actions in transferring the money to Iannelli somehow constituted a breach of the bank's rules" were to be read alone and out of context, it would require affirmance here. But that is not the way to read an opinion— or anything else. A statement in an opinion must be read in the light of the facts and contentions to which it is addressed. Squires claimed in this court that he could not be convicted unless he knew that Michaels was violating a specific directive from the bank's regional vice president. The quoted language was addressed to this specific contention. Moreover, there was evidence that Iannelli, who was forbidden by the bank from receiving additional credit, had outstanding unpaid loans and that his personal checking account was overdrawn. In sharp contrast to Docherty's case, there was also evidence that Squires' own status as a borrower was dubious. No credit check was run upon him; he used a false name in signing the note; and he misrepresented the purpose of the loan. Beyond this Squires was the actor in arranging meetings between Michaels, the bank officer who was being subverted, and Iannelli, the beneficiary. The distance between the two cases is enough so that, while Squires' case was properly found to fall within the statute, Docherty's does not.

The judgment of conviction is reversed, with instructions to dismiss the indictment.

LUMBARD, Circuit Judge (dissenting):

I do not think that the government has gone "beyond the verge" in this prosecution. Nor do I think it relevant to our decision, as does the majority, that Docherty received no personal benefit from the loans and may be able fully to repay them. A conviction as a con-

spirator or as an aider and abettor only requires that the defendant knew of the illegal activity and sought to forward it; he need have no other personal stake in the outcome. *See* United States v. McKnight, 253 F.2d 817, 819 (2d Cir. 1958). That the defendant is a 35-year old lawyer and himself derived no money from the scheme is relevant on matters of sentence and executive clemency; these facts in no way absolve him from guilt.

Docherty was convicted on one count of an indictment charging him with conspiring with Edward Evans to violate 18 U.S.C. §§ 656 and 1005 and on four substantive counts charging him with aiding and abetting Evans in violating § 656. Section 1005 prohibits making "any false entry in any [bank] book, report or statement." The majority reasons that since Docherty made no representation about the ultimate purpose of the loans, no false statement was made to the bank. This is a far too wooden reading of the statute. There is simply no doubt that the entries made here (based as they were on the incomplete loan application) conveyed an entirely false impression of the transaction. In fact, the loans were to Docherty in name only. Evans was to be the primary obligor and Docherty was acting solely as his agent. If the bank had been fully informed about the ultimate destination of the proceeds, it would have refused to make the loans as violative of both internal bank policy and state law. See New York Banking Law § 103, subd. 8. Without Docherty's misrepresentations the scheme would have failed.

The majority attempts to distinguish this case from Hargreaves v. United States, 75 F.2d 68 (9th Cir. 1935). *Hargreaves* also involved a bank officer arranging a loan of bank funds to a third party who had no genuine economic interest in the transaction and who was to transfer the loan proceeds to the bank officer. The defendant argued that no false entries were made because the notes "were correct as shown by the books of the bank." Hargreaves v. United States, *supra* at 72. Nonetheless, the court concluded that the officer was guilty of making false entries because he misrepresented the "true nature of the transaction." Hargreaves v. United States, *supra* at 72. Although the majority refers to the notes in *Hargreaves* as shams, they are no more nor less so than the notes given by Docherty. Both makers obtained the loans under their own names and were fully liable for the amounts due, regardless of intention or ability to pay.

To be convicted under section 656 Docherty must have known that Evans was effecting a conversion of bank funds. Despite intimations to the contrary in the majority opinion, it seems clear that Docherty's knowledge that Evans was misusing bank funds for his own ends would be sufficient knowledge of conversion to satisfy the statute. See Morissette v. United States, 342 U.S. 246, 271–272, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

A conviction for willful misapplication also requires an intent "to injure or defraud" the bank or "to deceive" a bank officer or agent appointed to examine the affairs of the bank. See 12 U.S.C. §§ 592, 597 (1945). Here Docherty had an intent to deceive. He deliberately misled bank officials into thinking that the loan was for his use when, in fact, the proceeds were going to Evans in violation of state law and bank policy. In addition, the intent to injure is also made out on these facts, since it clearly appears that Docherty willingly engaged in a scheme to enable Evans to use bank funds knowing full well that such loans were prohibited.

The majority uses a test which combines the foreseeability of loss with the degree of defendant's iniquity to determine whether there was sufficient evidence of criminal intent. By the majority's reasoning no violation of § 656 would occur when a bank officer decided to borrow bank money under an assumed name to finance stock speculations and other ventures, if he had every intention

at the time to repay the bank from a relatively secure source of future funds (like a declared but not yet payable dividend from a large corporation)—even if he later was unable to pay. Such a result would be unacceptable. As we held in United States v. Fortunato, 402 F.2d 79, 81 (2d Cir. 1968), "misapplication occurs when an officer of a bank knowingly lends money to a fictitious borrower or causes a loan to be made to his own benefit." Docherty deliberately, and with full knowledge of the illegality of what Evans was doing, made it possible for Evans to secure the funds. He has been found guilty upon sufficient evidence under a charge to the jury which correctly and fairly spelled out the elements of the crime charged.

The conviction should be affirmed.