**UNITED STATES of America,**
**Appellee,**

v.

**LUNG FONG CHEN aka Robert Chen, Joseph Liu, and Schuman Tu,**
**Defendants–Appellants.**

**Docket Nos. 02–1055(L), 02–1056(CON), 02–1073(CON) and 02–1124(XAP).**

United States Court of Appeals, Second Circuit.

Argued: Feb. 6, 2003.

Decided: Dec. 22, 2004.

Steven D. Gordon, Holland & Knight, LLP, New York, N.Y. (Jerry D. Bernstein and Michael N. Donofrio on the brief), for Defendant–Appellant Liu.

Alan M. Cohen, O'Melveny & Myers LLP, New York, N.Y. (JaneAnne Murray and Jeremy Maltby, on the brief) for Defendant–Appellant Chen.

Larry H. Krantz, Krantz & Berman, LLP, New York, N.Y. (Marjorie E. Berman and Mary Lou Chatterton, on the brief) for Defendant–Appellant Tu.

Kenneth Breen, Assistant United States Attorney, Eastern District of New York, Brooklyn, N.Y. (Barbara D. Underwood, Chief Assistant United States Attorney, Peter A. Norling and Jonathan S. Sack, Assistant United States Attorneys, on the brief), for Appellee.

Before: WALKER, Chief Judge, POOLER, Circuit Judge, and GLEESON, District Judge.*

* The Honorable John Gleeson, of the United States District Court for the Eastern District of New York, sitting by designation.

POOLER, Circuit Judge:

Lung Fong Chen, Joseph Liu, and Schuman Tu appeal from the January 18, 2002, judgment of the United States District Court for the Eastern District of New York (Edward R. Korman, *Chief Judge*), convicting them after a jury trial of conspiracy to misapply bank funds and to make false entries in bank records in violation of 18 U.S.C. § 371, misapplication of bank funds in violation of 18 U.S.C. § 656, and making false entries in bank records in violation of 18 U.S.C. § 1005. Chen and Liu contend that the district court's instruction on the intent element of misapplication of bank funds was erroneous. They also argue that statements of non-testifying codefendant Tu were admitted in violation of the Confrontation Clause and that the evidence was insufficient to convict them. Tu challenges the district court's failure to give two charges that reflected his theory of the defense. We find that the district court properly instructed the jury on the intent necessary to support a conviction for misapplication of bank funds. We also find that there was no Confrontation Clause violation, and that the evidence was sufficient to allow the jury to reach a guilty verdict. Finally, we hold that the district court did not err in refusing to give Tu's jury instructions. We therefore affirm.

## BACKGROUND

This case involves a lease agreement entered into by the Great Eastern Bank ("GEB") and the Seven Giants Company ("Seven Giants"). The members of the GEB Board of Directors ("the Board") and the partners of Seven Giants overlapped a great deal, and all three appellants were members of the Board and partners in Seven Giants. Defendants Chen, Liu, and Tu were all experienced in business, with backgrounds, respectively, as a real estate attorney, a certified public accountant, and a management professor and Wall Street consultant. Although all three defendants, along with others, had been central to the founding of the bank, a later power struggle had significantly decreased Tu's status at GEB by the time of the relevant events.

The lease in question involved a property on Main Street in Flushing, New York. Chen and Tu had acquired the property in the early 1980s. At Chen and Tu's urging, the GEB founders agreed to locate the bank's headquarters at the property. Concerned about the concentration of power in the hands of Chen and Tu, GEB's founders formed Seven Giants as the entity that would own the property. Completion of the headquarters building took several years, and GEB moved into the space in December 1989 pursuant to the lease at issue in this case.

In November of 1989, the Board authorized GEB's management team ("Management Team"), consisting of Chen, Liu, and Wen Y. Chen (a fourth codefendant in this case who has not appealed his conviction), to negotiate a lease of the headquarters property. The terms were supposed to be based on an independent appraisal created by Bradley & Co Appraisers, Inc. ("Bradley Appraisal"). The lease "negotiated" between GEB and Seven Giants was for a thirty-year term, with rental increases that were significantly above market according to the Bradley Appraisal's findings. The convictions in this case involve an upfront payment of one million dollars from GEB to Seven Giants in connection with this lease ("the million dollar payment"). A one-page agreement memorialized the terms of the million dollar payment and noted that the payment was reimbursement for: (1) "leasehold improvements to the Demised Premises for the sole benefit of Tenant"; (2) "a thirty (30) years lease instead of the Ten (10) years lease origi-

nally offered by Landlord"; and (3) "the right of first refusal in the event Demised Premises is for sale."

A short while after GEB had entered into the lease, GEB's outside auditor asked for additional information about the million dollar payment. In March 1990, the Board authorized appellant Chen to provide a more thorough description of the three reasons. Chen wrote a letter dated March 9, 1990, expanding upon those reasons. He specified that the leasehold improvements included items designed and built exclusively for GEB's use, such as a solid wall separating GEB's area from the remainder of the building, an elevator, and two staircases. He also explained that "a meter room, boiler room and telephone room [had] been relocated to the other part of the building in order to give more usable space to the Bank." With respect to the thirty-year lease, Chen wrote that GEB's ability to negotiate the longer lease was of great value to it and that the payment was partial compensation to the owner for the "decrease in the value of the real estate as investment." Finally, Chen noted that the right of first refusal was "an asset to the tenant."

In 1997, the Federal Reserve Bank of New York ("FRBNY") sought information from GEB concerning the million dollar payment. GEB's banking attorney, relying on information provided by Chen and Liu, among others, told FRBNY that GEB and Seven Giants had an unwritten understanding that the million dollar payment would be credited to GEB in the event GEB ever purchased the property from Seven Giants. In accordance with this position, GEB and Seven Giants entered into a agreement "amending and supplementing" the original lease agreement ("Supplemental Agreement"). The Supplemental Agreement indicated that "[Seven Giant's] intention is, and has always

been, to provide to [GEB] an option to purchase the Premises within a reasonable period after commencement of the Lease on terms which provide to the Tenant the benefit of" the million dollar payment.

The government charged four members of the Board, including Chen, Liu, and Tu, with conspiracy to misapply bank funds and to make false entries in bank records in violation of 18 U.S.C. § 371, misapplication of bank funds in violation of 18 U.S.C. § 656, and making false entries in bank records in violation of 18 U.S.C. § 1005. Furthermore, in connection with the making of the Supplemental Agreement, the government charged defendants Chen and Liu with additional counts of conspiracy to make false entries in bank records, in violation of 18 U.S.C. § 371, and of making false entries in the books and records of a bank, in violation of 18 U.S.C. § 1005.

Prior to the indictments in this case, defendant Tu attempted to cooperate with the government. He attended four sessions with interviewers from the Federal Bureau of Investigation ("FBI") and FRBNY. The interviews were conducted partly in English and partly in Mandarin Chinese, with FBI Special Agent Herman Ng serving as translator. Tu's efforts to become a cooperator ultimately proved unsuccessful.

At trial, David Bradley, whose firm had created the Bradley Appraisal purportedly relied upon by the Board, explained why the lease, particularly when viewed in conjunction with the million dollar payment, resulted in payments to Seven Giants that were substantially above market value. Bradley testified that although an upfront payment was not per se improper, ordinarily a tenant who makes such a payment would expect to receive a corresponding decrease in rental payments. Bradley testified that, in this case, the tenant should have paid "substantially less" rent for the

first five years. The government's proof showed that instead, GEB was to pay $373,550 (a figure not discounted to reflect the time value of money) in rent and taxes above what the Bradley Appraisal had recommended.

As for the three specific reasons memorialized in the rental agreement, the government presented extensive evidence at trial showing that the three benefits identified were worth much less than one million dollars. With respect to the "leasehold improvements," the government elicited testimony from Bradley indicating that the Bradley Appraisal reflected the value of the elevator and the staircases, and that consequently, the calculation of the rent was higher than it otherwise would have been. Accounting for these items in the million dollar payment and in higher rents meant double payment for GEB. The architect of the headquarters testified that the relocation of the meter, boiler, and telephone room had never occurred; nor had Seven Giants been billed for any such relocation.

The government questioned both Bradley and its own expert witness D. Kenneth Patton about the effect the longer lease had on the value of the property. Bradley explained that if a lease calls for above-market increases in rent, it is an asset to the landlord. Patton explained the benefits a landlord receives from the guaranteed increases in the rental stream and opined that a tenant would ordinarily not have to pay a landlord upfront to get a longer-term lease.

Patton also testified that the right of first refusal was of little or no value to GEB. Any outside party buying the property would be willing to pay an above-market price because of the above-market rental payments being made by GEB. To exercise the right of first refusal, GEB would have to match that above-market price. Thus, the right was of negligible value at most.

The government also relies on the later creation of the Supplemental Agreement to further undercut the bona fides of the defendants' original three reasons. It should be noted that the jury acquitted Chen and Liu of the charges related to the Supplemental Agreement. Nonetheless, the government convincingly argues that the post hoc creation of a document presenting an entirely new fourth justification for the million dollar payment evidenced the defendants' awareness of the insufficiency of the original three justifications.

The jury returned a guilty verdict with respect to all defendants on the first three counts. This appeal followed. Chen and Liu challenge the jury instructions on the intent necessary to support a conviction for misapplication of bank funds. They claim that the introduction of Tu's statements through the testimony of Agent Ng violated *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). They also challenge the sufficiency of the evidence. Tu filed a separate brief arguing that the court failed to instruct the jury in accordance with his theory of defense.

## DISCUSSION

### I. The Misapplication of Bank Funds Charge

■ Chen and Liu contend that the jury instructions on misapplication of bank funds were flawed in two ways. First, they argue that the district court's references to civil fiduciary duties allowed the jury to convict them based on a finding that they had breached those civil duties. Second, they challenge the district court's refusal to direct the jury to find that defendants acted with knowledge that their conduct was unlawful.

The misapplication of bank funds statute ("Section 656") prohibits bank officers and directors from "embezzl[ing], abstract[ing], purloin[ing] or willfully misappl[ying]" bank funds. 18 U.S.C. § 656. The pre–1948 version of the statute included a requirement of intent "to injure or defraud the bank or to deceive a bank officer or agent appointed to examine the affairs of the bank." *United States v. Docherty,* 468 F.2d 989, 994 (2d Cir.1972), *abrogated on other grounds as recognized in United States v. McElroy,* 910 F.2d 1016, 1025 (2d Cir.1990) (internal quotation marks omitted). We have consistently held that despite the omission of this language from subsequent versions of the statute, this intent requirement remains an element of the offense. *Docherty,* 468 F.2d at 994; *see also McElroy,* 910 F.2d at 1024.

The challenged jury instruction on Section 656 intent read:

> To act with the intent to [defraud] is to act knowingly and deliberately for the purpose of taking a financial advantage of a fiduciary relationship.
>
> A bank officer or director is a fiduciary of the bank. As such, he owes loyalty and allegiance to the bank. A loyalty that is undivided and an allegiance that is influenced in action by no consideration other than the welfare of the bank.
>
> He may not profit at the expense of the bank and in conflict with its rights. While related-party transactions are not prohibited, a director acts with the intent to defraud the bank if he knowingly and deliberately uses his position to obtain money belonging to the bank for himself or others, for which the bank does not receive a comparable benefit or value in return.
>
> In the present case, in order to determine whether the defendants deliberately took advantage of the fiduciary relationship with the Great Eastern Bank to obtain money of the bank for the benefit of Seven Giants and for themselves, it is not enough to conclude that the bank overpaid Seven Giants or that it made a bad business decision.
>
> In the course of our life's experience, we sometimes obtain a bargain because someone unknowingly failed to judge the value of the goods or property he sold us and sometimes we ourselves overpay because we mistakenly overvalue the goods or property we purchase.
>
> What is necessary here to find the requisite element of the intent to defraud is (1) that a defendant deliberately used his position as a director of the Great Eastern Bank to cause the bank to pay one million dollars as part of the lease transaction to Seven Giants and (2)[ ] that the defendant knew that the one-million dollars paid was substantially more then the value of what a person, totally unrelated to Seven Giants, would have paid for what Great Eastern Bank received in return from Seven Giants.
>
> . . . .
>
> If, at the time the lease was signed, a defendant entertained a good faith belief that the value of what Great Eastern Bank received in return from Seven Giants was not substantially less than the one-million dollars it paid, then he did not act with the intent to defraud the Great Eastern Bank when he voted to approve the one-million dollar payment to Seven Giants and received a portion of that payment.

We find that this instruction adequately conveyed to the jury that it was required to find that the defendants specifically intended to injure GEB and, hence satisfied the scienter requirement of Section 656.

■ Contrary to defendants' arguments, Section 656's intent requirement is properly read in the disjunctive and thus proof of

intent to injure *or* defraud is sufficient to support a conviction. *See Valansi v. Ashcroft,* 278 F.3d 203, 210 (3d Cir.2002) ("Because the [scienter] element is stated in the disjunctive, it may be shown either by intent to injure or intent to defraud."); *United States v. Angelos,* 763 F.2d 859, 861 (7th Cir.1985) ("[I]t is important to distinguish between intent to injure and intent to defraud; either will do, and they are not the same."). As we explain below, because we conclude that the instruction given required the jury to find that the defendants intended to injure GEB, we need not also consider whether the instruction adequately instructed the jury to find that defendants intended to defraud the bank.

Most of this Circuit's misapplication of bank funds cases have involved different factual circumstances than those in the case at hand. Typically we have addressed situations where bank officers made loans that were fraudulent or that violated bank regulations in some way. *See McElroy,* 910 F.2d at 1019–20; *United States v. Castiglia,* 894 F.2d 533, 534–35 (2d Cir.1990); *United States v. Clark,* 765 F.2d 297, 299–301 (2d Cir.1985); *United States v. Cleary,* 565 F.2d 43, 45–46 (2d Cir.1977); *Docherty,* 468 F.2d at 990–92; *United States v. Iannelli,* 461 F.2d 483, 484 (2d Cir.1972); *United States v. Fortunato,* 402 F.2d 79, 80 (2d Cir.1968). In all of these cases, we have focused much of our attention on the mens rea necessary when these fraudulent or otherwise incorrect loans have been made. With improper loans, particularly loans made to third parties with no direct benefit to the defendant, the necessary intent may be hard to prove. Indeed, we have twice overturned convictions because of problems with the intent element. In *Cleary,* we held that the trial court should have allowed the jury to hear evidence of repayment. 565 F.2d at 47. We also held that the court should

have instructed the jury to consider whether the named debtor had the ability to repay and whether he actually did repay the loan in determining whether the defendant had the requisite intent to expose the bank to loss. *Id.* at 47–48. The primary issue in *Docherty* was also whether there was sufficient evidence on the intent element. 468 F.2d at 995. The Court found that the evidence of defendant's intent to injure the bank was insufficient, because the defendant, who was taking out the loans in his own name and passing the money to his bank officer friend, knew that he was liable for repaying the loans and because there was no suggestion that defendant did not have the means to repay the loans. *Id.* In reaching this conclusion, the Court held that under the circumstances of that case, the violation of a bank rule, standing alone, was insufficient evidence of intent to injure or defraud. *Id.*

■ Our task in evaluating the jury instructions and evidence in this case is not nearly so problematic. The theory of the misapplication of funds here involved a much simpler type of transaction, and the intent is therefore somewhat easier to discern. The theory of the case is that the defendants misapplied bank funds by arranging for GEB to make the one million dollar payment to Seven Giants, although they knew that GEB was not obtaining substantially equivalent value in return. If the bank is not receiving fair value, the harm to the bank is certain at the time of payment. The jury was instructed to determine intent by discerning whether defendants knew that the payment was substantially unfair to GEB and nonetheless acted deliberately in approving the payment from GEB to Seven Giants. While this instruction claimed to be describing the element of "intent to defraud," it actually set forth the test for intent to injure. However, this minor mis-description

amounts to no more than harmless error because the jury, using the court's instruction, still found the requisite intent, albeit under the wrong name. *See United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996) ("An error is deemed harmless if we are convinced that the error did not influence the jury's verdict.").

The district court did not err in adapting its instructions to the particular circumstances of this case. In fact, we have held that a "district court must tailor its instructions to the facts of the case before it." *United States v. Regan*, 937 F.2d 823, 828 (2d Cir.1991). Nor did the court err when, faced with the largely inapposite case law and instructions from this Circuit, it looked to our sister circuit for some guidance. Rather, the instruction ultimately developed by the district court fully accords with the law of this Circuit. The court clearly told the jury that it could only convict if it found "(1) that a defendant deliberately used his position as a director of the Great Eastern Bank to cause the bank to pay one million dollars as part of the lease transaction to Seven Giants and (2)[ ] that the defendant knew that the one-million dollars paid was substantially more than the value of what a person, totally unrelated to Seven Giants, would have paid for what Great Eastern Bank received in return from Seven Giants." A guilty verdict necessarily included a finding that defendants acted deliberately although they knew that GEB would suffer some financial harm by entering into a transaction in which it did not receive fair value. This clearly satisfies the Section 656 intent requirement.

■ We do not suggest that a version of these instructions would be appropriate in every misapplication of bank funds case. For example, we doubt whether in the improper loan context, it would be sufficient to instruct the jury to convict if "(1)

the defendant deliberately used his position as director to make a loan (2) that he knew was risky and was likely to put the bank in financial difficulty," although, like the instructions in the case at hand, this formulation contains a reference to deliberate action combined with knowledge of harm to the bank. We emphasize that "a charge that is adequate and proper in one case may not play the same role in another case involving a different set of facts." *Regan*, 937 F.2d at 828. As we noted in *Docherty*, 468 F.2d at 995, "[a] statement in an opinion must be read in the light of the facts and contentions to which it is addressed."

■ Chen and Liu's specific challenges to the instructions are without merit. As indicated by our discussion above, the instructions of the district court clearly required the jury to find intent, a much higher standard of scienter than the simple negligence required in a breach of civil fiduciary duties. The references to civil fiduciary duty, while less than ideal, did not alter the fact that the jury specifically had to find deliberate action in the face of knowledge of harm to GEB. The defendants' contention that the jury should have been instructed that the defendants must know that their conduct is unlawful is equally unpersuasive, considering that the district court found that the defendants' approval of the lease was "deliberate." After all, "in many contexts, [ ] 'willfully' refers to consciousness of the act but not to consciousness that the act is unlawful." *Cheek v. United States*, 498 U.S. 192, 209, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (Scalia, J., concurring) (citing *Am. Sur. Co. of New York v. Sullivan*, 7 F.2d 605, 606 (2d Cir.1925)).

## II. The Alleged *Bruton* Violation

■ Chen and Liu contend that the court's admission of certain statements of

codefendant Tu violated their Sixth Amendment rights under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). These statements were admitted through the testimony of Agent Ng, who was present during the interviews with Tu when he was attempting to become a cooperating witness.

■ In *Bruton*, the Supreme Court held that the Confrontation Clause of the Sixth Amendment prohibits the introduction of the confession of a non-testifying codefendant that implicates the defendant in a crime. *Id.* at 126, 88 S.Ct. 1620. A court cannot cure the introduction of such a statement through a limiting instruction. *Id.* at 137, 88 S.Ct. 1620. In *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Court limited the reach of *Bruton* by holding that when a confession is redacted so that it does not facially incriminate the defendant, its admission with a proper limiting instruction does not violate the Confrontation Clause. *Id.* at 211, 107 S.Ct. 1702. The Court did leave open the question of "the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Id.* at 211 n. 5, 107 S.Ct. 1702. The Court answered the question left open in the *Richardson* footnote in *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), holding that *Bruton* does apply to "statements that, despite redaction, obviously refer directly to someone, often obviously to [the defendant], and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* at 196, 118 S.Ct. 1151.

Chen and Liu contend that the statements of Tu attributed criminal intent to the entire GEB Board. They note that the jury heard testimony that Liu and Chen were key players on the GEB Management Team who advocated for the lease transaction and for the three reasons memorialized in the Board's minutes. Chen and Liu's attempts to bring Tu's statements under the *Bruton* rule fail. Although some of Tu's statements may implicate the Board as a whole, they only do so with the assistance of other testimony. The most relevant portions of Ng's testimony are excerpted below:

Q. During the interview, did you ask the defendant certain questions about the $1 million payment from the bank to Seven Giants?

A. Yes, I did.

Q. When you asked questions about the million-dollar payment, what term did the defendant use in English to refer to the $1 million payment?

A. Mr. Tu told me that the transaction was in English, "inside transaction."

Q. Did you ask Mr. Tu, in substance, what his view of this inside transaction was?

A. When I asked him about that transaction, Mr. Tu told me that that was not right and it was the wrong thing to do.

Q. Do you recall the word or words he used to just express what you just said? Not right or wrong?

A. Mr. Tu used the term in Chinese bu dui

. . .

Q. And what does that word mean?

A. The word bu dui means not right and wrong.

Q. Did you ask Mr. Tu why, in his mind, it was not right or wrong to pay the million dollars?

A. Yes, I did.

Q. And what, in substance, did Mr. Tu say?

A. Mr. Tu told me that as a bank officer, his duties are to look out for the benefits of the bank and the depositors. To transfer the money to themselves, the Board of Directors, it was a wrong thing to do.

Q. According to Mr. Tu, at what point in time did he think this million-dollar payment was not right; wrong?

A. Mr. Tu told me that during a certain Board meeting when the discussion of transferring the million dollars to the directors, at that Board meeting, *they found that it was the wrong thing to do as the Board of Directors. It was against the duties as the Directors of a bank.*

. . .

Q. Did you question Mr. Tu about the three reasons given by the bank for the $1 million payment, reasons given at the time of the payment?

A. Yes, I did.

. . .

Q. Do you recall when you asked him about those three reasons, what word or words he used to express his view of those three reasons?

A. When I asked Mr. Tu about those three reasons, Mr. Tu told me that those reasons were—he used the word bu dui, meaning not right and wrong.

. . .

Q. Do you recall what, if anything, Mr. Tu said about leasehold improvements, one of the three reasons?

A. Yes, I did. Mr. Tu told me that the reasons are not right because the first reason as stated in here was leasehold improvement. There's no leasehold improvement involved. All the construction inside the bank were done and paid for by the bank to contractors. So, there might be some minor things but those minor improvements did not come anywhere close to a million dollars.

. . .

Q. Do you recall what, if anything, Mr. Tu said about the remaining two reasons; the thirty-year lease and the right of first refusal?

A. Mr. Tu also told me that those two reasons are wrong and not right reasons.

Q. And again, what word did he use again?

A. He again used the word bu dui.

Q. *And the close of your questions about these three reasons, did you ask the defendant in substance why, in his understanding, these three reasons were included in the minutes if they were wrong?*

A. *Yes, I did.*

Q. *And what did Mr. Tu say?*

A. *When I asked Mr. Tu that if the reasons were wrong and not right answers for the transfer of the million dollars, then why is it recorded in the minutes? Mr. Tu told me that it's fake. It's falsely made up to cover the transaction.*

We have added emphasis to the testimony subsequently struck by the district court upon the urging of Chen and Liu. The district court indicated that the stricken testimony was "prejudicial because of the considerations underlying the confrontation clause."

Chen and Liu argue that all of Tu's statements regarding the Board violated *Bruton,* as that case was applied and interpreted in *Gray.* Although the line between testimony that falls within *Bruton*'s scope and that which does not is often difficult to discern, we are persuaded in the instant

case that the statements by Tu, including those which the district court agreed to strike, either do not implicate Chen and Liu at all or else fall squarely within the *Richardson* holding. Many of Tu's statements concern only his state of mind. The statements that inculpate other board members only do so when placed in context with other testimony outside of Tu's statements. Although, in certain instances, evidence that does not directly name a co-defendant can implicate *Bruton, see Gray*, 523 U.S. at 195, 118 S.Ct. 1151 (observing that the use of "[i]nference pure and simple [to connect testimony to a co-defendant] cannot make the critical difference" regarding whether a statement implicates *Bruton*), this case falls safely outside of *Bruton*'s scope because substantial evidence was necessary to link defendants Chen and Liu with Tu's statements regarding the Board. *See id.* at 196, 118 S.Ct. 1151. Chen and Liu implicitly recognize this point in their brief, when they note that Tu's statements "powerfully implicate[ ] all members of the GEB Board . . . because the jury heard testimony and argument by the Government that Liu and Chen were key players on the GEB 'management team' that developed and advocated for the lease transaction and for the three reasons memorialized in the Board's minutes."

Chen and Liu also direct our attention to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), suggesting that it provides additional support for their position.[1] In *Crawford*, the Supreme Court held that an out-of-court "testimonial" statement offered against an accused is inadmissible unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. 124 S.Ct. at 1374. However, the Supreme Court refused to provide a comprehensive definition of the term "testimonial," explaining only that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* Nevertheless, we need not determine at this stage whether the results of a failed proffer session fall within this loose definition. For *Crawford* to provide assistance to Chen and Liu, Tu's statements must have been admitted against them. As discussed above, Tu's statements inculpate Chen and Liu only in the context of the substantial evidence used to link them to Tu's statements. The same attenuation of Tu's statements from Chen and Liu's guilt that prevents *Bruton* error also serves to prevent *Crawford* error. Thus, there is no separate *Crawford* problem, and we see no indication that *Crawford* overrules *Richardson* or expands the holding of *Bruton*. We therefore do not find that the admission of any of Tu's statements violated the Confrontation Clause.

## III. Insufficiency of the Evidence

■ When considering a challenge to the sufficiency of the evidence after a jury has rendered a guilty verdict, we view the evidence in the light most favorable to the government, *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and construe every permissible inference in the government's favor, *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985). We affirm the conviction so long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original). Chen and Liu's challenge to the sufficiency of the evidence fails.

---

**1.** In response, we requested supplemental briefing on this issue, and have carefully considered the parties' arguments as presented therein.

■ As we discussed above, the government presented convincing evidence that the three proffered justifications could not account for the value received by the bank in making the million dollar payment. From this proof, the jury could easily infer that Chen and Liu, as experienced professionals, were fully aware of the lopsided nature of the transaction, and nonetheless elected to push the transaction through the Board for the benefit of the interested directors, including themselves. Beyond the very strong circumstantial case, the government also elicited testimony from directors Paul Lee and Guang Tsan Wang suggesting that Chen and Liu had the necessary intent to harm the bank. For example, Lee testified that the three reasons were not real reasons, and Wang testified that, after his original vote to abstain, he was told by a member of the Management Team that it would not look good for an outside director to abstain. Although Lee and Wang may not have provided testimony that was exclusively in support of the government, given the standard by which we analyze sufficiency of the evidence challenges, it is clear that the jury could have used portions of their testimony in finding the element of intent.

To the extent that Tu joined Chen and Liu's challenge to the sufficiency of the evidence, we also find that the evidence was sufficient with respect to his conviction. Of course, given Tu's less powerful status on the Board, not all the evidence implicating Chen and Liu also implicated him. However, with respect to Tu, the jury was also able to consider the testimony of Agent Ng about Tu's statements, which the jury could interpret as admissions of his culpable intent.

## IV. Tu's Requested Jury Instructions

■ In a separate brief, Tu argues that the district court erroneously refused to give two jury instructions that were central to his theory of the defense. Tu's trial strategy was to show that he did not intend to misapply bank funds, but rather acted in good faith reliance upon the recommendation of the Management Team. Tu had sought an instruction regarding New York State Banking Law § 7015, which states that in discharging his duties, a director of a bank may rely in good faith upon a report prepared in the ordinary course of business by an officer or committee charged with responsibility for such report. Tu had also requested a good faith reliance charge that did not marshal evidence in favor of the government. "We will vacate a conviction on account of a missing requested instruction if (1) the requested instruction was legally correct; (2) it represents a theory of defense with basis in the record that would lead to acquittal; and (3) the theory is not effectively presented elsewhere in the charge." *United States v. Prawl,* 168 F.3d 622, 626 (2d Cir.1999) (internal quotation marks omitted).

Tu requested a charge that read:

Defendant Schuman Tu contends that he acted in good faith in connection with the lease transaction at issue because he relied, in part, on statements made by members of the Management Team of the Bank .... I instruct you that a Bank Director, when acting in good faith, may rely upon reports prepared in the ordinary course of business by an officer or committee charged with the responsibility of preparing such a report. N.Y.S. Banking Law Section 7015. Accordingly, you may consider any such good-faith reliance by Schuman Tu in determining whether he acted in good-faith in connection with the lease transaction, the million dollar payment or the reasons given by [GEB] for that lease transaction and payment.

The court initially declined to instruct the jury on Section 7015 as Tu requested, because it found that "as a matter of law, [the statute is] not applicable here." The court explained that Tu could not "entertain a good faith belief in what other directors tell [him] with respect to representations they make in a transaction [in] which you know they have a personal interest."

The Court had proposed a good faith reliance charge that read:

> There is evidence of statements made by members of the Management Team of the bank concerning the reasonableness of the 30 year lease, the reasonableness of the million dollar payment and the accuracy of the reasons given by GEB for that payment in the lease transaction as well as its legality. Defendant Schuman Tu argues that this evidence establishes that he relied on the accuracy of these representations and entertained a good faith belief that the value of what GEB received in return from Seven Giants was not substantially less than the $1 million it paid.
>
> A good faith belief is not a blind faith belief. It means that a reasonable person in the defendant's position would have relied on these representations. In determining whether defendant Schuman Tu relied in good faith on these representations you should consider who made the statements, whether they had a personal interest in securing the $1 million payment for Seven Giants, and whether, if there was such a personal interest on the part of the person or persons making the representations, defendant Schuman Tu was aware of it.
>
> If defendant Schuman Tu entertained a good faith belief that the value of what GEB received in return from Seven Giants was not substantially less than the $1 million it paid, then he did not act

with the intent to defraud GEB when he voted to approve the $1 million payment to Seven Giants and received a portion of that payment.

After Tu's counsel criticized the reference to an objective "reasonable person" standard, the court agreed to take out the sentence including that reference. Tu's counsel then challenged the instruction because of the way that it "marshal[ed] the negative elements." He argued that if the court included the negative evidence he should be able to "marshal[ ] the other side of the story, which is that these were people who ran the bank, the[y] regularly had committees, Schuman Tu was not in power at the time, he had no reason to think they were breaching their duty in this transaction, because they all had been loyal to the bank in the past." However, noting that this would create a "whole laundry list," Tu's counsel suggested that an even more appropriate course would be to instruct the jury to consider "the totality of the circumstances" and to allow both prosecution and defense to argue the facts. He therefore requested that the court instruct the jury with a "plain vanilla" reliance charge. This new charge proposed by Tu read:

> There is evidence of statements made by members of the Management Team of the bank concerning the reasonableness of the 30 year lease, the reasonableness of the million dollar payment and the accuracy of the reasons given by GEB for that payment in the lease transaction as well as its legality. Defendant Schuman Tu argues that he relied on the accuracy of these representations in connection with the Board's decision to go forward with the lease transaction. You may consider any such good-faith reliance, if established by the evidence, in determining Schuman Tu's state of mind at the relevant time period.

When the court declined to give the "plain vanilla" charge, Tu's counsel asked that it remove the good faith reliance charge altogether.

The relevant part of the state banking law reads:

> Directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions. In discharging their duties, directors and officers, when acting in good faith, may rely upon ... reports ... prepared in the ordinary course of business by an officer or committee charged with the responsibility therefor.

N.Y. Banking Law § 7015(1). Tu's contention that the district court summarily rejected a Section 7015 charge is contradicted by the record. It is true that the court originally emphasized that the statute was inapplicable as a matter of law. However, after the court had reiterated that the "statute is not applicable here," Tu's counsel interjected, "[b]ut, for criminal purposes, your Honor...." At that point, the court appears to have been persuaded that there might be a limited use for the statute: "For criminal purposes, you could try and persuade the jury you relied on it. But, you know, I think it's important to call attention to the facts which go to the ultimate question of good faith reliance." This indicates that the district court was open to instructing the jury on the statute, if the instruction referenced the personal interest of those preparing the reports. However, Tu demonstrated that he was opposed to any sort of good faith instruction that called attention to the fact that the Management Team had an interest in the transaction about which he was informed. We agree with the district court that Tu could only use the statute for the limited purpose of demonstrating that, because of his good faith reliance, he lacked the necessary intent to defraud.

 Thus, with respect to both Tu's contentions, the important question is whether the court erred in insisting that the jury, in evaluating Tu's good faith defense, be instructed to "consider who made the statements, whether they had a personal interest in securing the $1 million payment for Seven Giants, and whether, if there was such a personal interest on the part of the person or persons making the representations, defendant Schuman Tu was aware of it." The district court did not err in insisting that it should instruct the jury that a "good faith belief is not a blind faith belief" and that the jury should consider whether the members of the committee upon whom Tu purportedly relied had a personal interest in the transaction of which Tu was aware. Indeed, the district court "has broad discretion to decide which facts, if any, it will mention in its comments to the jury." *United States v. GAF Corp.*, 928 F.2d 1253, 1263 (2d Cir. 1991). This discretion is limited only by "the requirement that the charge be fair to both sides." *Id.* The language proposed by the court does not marshal evidence in favor of the prosecution; it merely gives balance and context to Tu's good faith reliance charge. The court properly insisted that the jury needed to understand that good faith reliance cannot be evaluated without taking into account the personal interests of those upon whom Tu allegedly relied and Tu's knowledge of those interests. Thus, the district court's charge was fair to both sides.

Moreover, in *United States v. McElroy*, 910 F.2d 1016 (2d Cir.1990), we rejected defendant's contention that the district court's failure to give an instruction on a good faith defense constituted reversible

error. We found that the court's general instructions on intent to defraud the bank "conveyed the essence of a 'good faith defense' instruction." *Id.* at 1026. Here, in addition to the intent to defraud instruction that we have approved, the court also gave a good faith instruction:

> If, at the time the lease was signed, a defendant entertained a good faith belief that the value of what Great Eastern Bank received in return from Seven Giants was not substantially less than the one-million dollars it paid, then he did not act with the intent to defraud the Great Eastern Bank when he voted to approve the one-million dollar payment to Seven Giants and received a portion of that payment.

Following our precedent in *McElroy*, we conclude that this instruction was sufficient to convey the essence of Tu's requested good faith reliance instruction.

**V. Sentencing Issues**

At the close of trial, the jury was only asked to determine guilt and did not confirm the amount of funds that were mishandled. Therefore, it appears that *Blakely v. Washington,* — U.S. —, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), might have some relevance. While the defendants did not raise any sentencing issues on appeal and did not bring *Blakely* to the attention of the panel, we stay the issuance of the mandate in this case out of an abundance of caution. The mandate will be held pending the Supreme Court's expected decision in *United States v. Booker,* No. 04–104, 2004 WL 2331491, and *United States v. Fanfan,* No. 04–105, 2004 WL 2331491 (October 4, 2004). Should any party believe there is a need for the district court to exercise jurisdiction prior to the Supreme Court's decision, it may file a motion seeking issuance of the mandate in whole or in part. Although any petition for rehearing should be filed in the normal course pursuant to Rule 40 of the Federal Rules of Appellate Procedure, the court will not consider the waiver or substance of any issue concerning defendant's sentence until after the Supreme Court's decision in *Booker* and *Fanfan.* In that regard, the parties will have until fourteen days following the Supreme Court's decision to file supplemental petitions for rehearing in light of *Booker* and *Fanfan.*

**CONCLUSION**

For the reasons discussed above, we affirm the convictions.